Freddie H. DREYER, Plaintiff,

v.

Frances JALET, Defendant.

Robert SLAYMAN, Plaintiff,

v.

Frances T. Freeman JALET, Defendant.

Donald Allen LOCK, Plaintiff,

v.

Frances T. Freeman JALET, Defendant.

Civ. A. Nos. 71–H–973, 71–H–1149 and 72–H–246.

United States District Court, S. D. Texas, Houston Division.

Sept. 18, 1972.

---

Max H. Jennings, Clawson & Jennings, Houston, Tex., for plaintiff Dreyer.

Thomas M. Phillips, Baker & Botts, Houston, Tex., for plaintiff Slayman.

Donald K. Eckhardt, Haynsworth, Reynolds, Steber, Eckhardt & Graml, Houston, Tex., for plaintiff Lock.

William W. Kilgarlin, Kilgarlin & Dixon; Frederick S. Grossberg; William K. Kimble; Stuart M. Nelkin; Henry M. Rosenblum, Rosenthal, Didion, Rosenblum & Co.; David H. Berg; Houston, Tex., for defendant.

## MEMORANDUM OPINION

CARL O. BUE, Jr., District Judge.

### I.

### THE NATURE OF THE LITIGATION

In these three closely related civil actions plaintiffs, prisoners in the custody of the Texas Department of Corrections, seek injunctive relief in an effort to bar defendant, a VISTA lawyer who is licensed to practice law in the State of Texas, from the prison system as a result of her alleged activities to organize

and, in effect, to instigate an uprising among the inmate population within the Texas prison system. Jurisdiction is predicated upon (1) the Civil Rights Act of 1871, 42 U.S.C. § 1983; (2) diversity of citizenship, 28 U.S.C. § 1332; and (3) the Court's pendent jurisdiction in conjunction with the Texas injunctive statute, Tex.Rev.Civ.Stat.Ann. art. 4642.

## A.

### THE COMPLAINTS

In dramatically worded complaints plaintiffs allege that defendant has organized and implemented a conspiracy with recalcitrant inmate-clients which is aided by the unwitting acquiescence or response of prison officials or employees. Such conspiracy is allegedly aimed at the overthrow of the administration of the Texas Department of Corrections (TDC) by causing violence, threats of violence, unrest among inmates, planned incidents and confusion through the dissemination of false rumors. It is alleged that defendant in furthering her plans in conspiracy with other inmate-clients has caused plaintiffs to be threatened and beaten because they would not yield to such plans to promote unrest and violence within the various units of the TDC. It is additionally asserted that in effecting the conspiracy defendant has made over five hundred visits to various inmates in the TDC and that through the use of the rules regulating such visits and the unwitting acquiescence or response to the TDC officials in permitting her to see them she has succeeded in establishing numerous ostensible attorney-client relationships in furtherance of her conspiratorial goals. The claim is made that as a consequence plaintiffs have suffered irreparable injury in derogation of their right to be free from harassment, intimidation, physical injury, threats of death, and cruel and unusual punishment pursuant to the Fourteenth and Eighth Amendments of the United States Constitution as well as deprivation of their vested rights and privileges as inmates of the TDC pursuant to Texas statute.

In the first lawsuit plaintiff Dreyer alleges that the defendant attempted to recruit him to join the unlawful conspiracy and upon his repeated refusals he was threatened and later beaten by her inmate-clients and agents. This prisoner also contends that he lost his prison job and privilege to work as a result of these actions. In the second lawsuit, plaintiff Slayman asserts that defendant attempted to coerce him into signing a false statement concerning the death of a fellow inmate in which the blame was to be squarely placed upon the brutality of prison officials. This prisoner also contends that defendant attempted to coerce him into testifying in Court about brutality practices of prison officials of which he had no knowledge or desire to give testimony. Thereafter, defendant's inmate-clients allegedly threatened this prisoner's life. In the third lawsuit, plaintiff Lock asserts that the defendant attempted to coerce him into signing a fictitious statement which charged that a warden had brutally beaten him. Upon his repeated refusals, this prisoner was allegedly threatened and later beaten by defendant's inmate-clients.

## B.

### THE ANSWERS AND THE COUNTERCLAIMS

In response to plaintiffs' charges, defendant asserts that the various complaints fail to state a viable cause of action under the Civil Rights Act, 42 U. S.C. § 1983, and that there is a lack of diversity jurisdiction under 28 U.S.C. § 1332. In regard to the latter contention it is urged that there is both a lack of diversity of citizenship and an absence of the requisite jurisdictional amount in controversy in order to satisfy such statute. The defendant further contends that the rights asserted to have been violated are incapable of the requisite pecuniary valuation. It is also claimed that only plaintiff Lock may seek relief based upon any theory of pendent juris-

diction since, according to defendant, only he has properly pleaded for such relief.

With regard to the specific factual allegations of the plaintiffs, defendant asserts that the visits and the communications with the inmate-clients at TDC were entirely legitimate attorney-client relationships which never embraced the consideration of violence in any form. Defendant contends that any inmate response to her efforts to assist them was a necessary concomitant of a justifiable and legal pursuit to rectify improper practices and conditions predominating in the TDC. It is further urged that if plaintiffs were, in fact, harassed or beaten by fellow inmates, which is denied, such actions were not in any way suggested, encouraged, approved, or acquiesced in by defendant. Finally, it is contended that these lawsuits were specifically instigated by plaintiffs as a result of promises of benefits made to plaintiffs including early paroles, or, conversely, as a result of threats of reprisal by TDC officials if there was a lack of cooperation in the prosecution of these actions by the plaintiffs.

In further response to plaintiffs' complaints, defendant has counterclaimed in each action for damages. In these counterclaims it is asserted that the complaints of plaintiffs are a part of an overall conspiracy originated and manipulated by the Director of the Texas Department of Corrections and joined in by the Attorney General of Texas to deprive defendant of her right to practice law and to consult with inmate-clients confined at the TDC. In this regard defendant asserts that in the course of her representation of inmate-clients various meritorious civil actions have been instigated against the TDC. It is contended that as a result of these actions inmates have been successful in some instances in having many condemnatory TDC practices and conditions censured by Court ruling. Defendant urges that the TDC Director and the prison administration have attempted to bar her from representing inmates solely to preclude further public criticism and adverse court action condemning the operations and management of the TDC. The effect of this conspiracy, according to the counterclaims, will be to terminate the attorney-client relationships which presently exist between defendant and certain inmate-clients with a resulting interference with her right to practice law. To secure the ouster of defendant, it is alleged in the counterclaims that the TDC Director and State Attorney General have used the plaintiffs as mere unknowing conduits in this unlawful conspiracy. It is asserted that as a result of this conspiracy defendant has suffered anxiety, distress and a loss of reputation as a practicing lawyer to her substantial professional and monetary detriment.

## C.

### THE PRELIMINARY MATTERS

Preliminarily and prior to the evidentiary hearing in these civil actions, the Court, upon application of the inmate plaintiffs and submission of proof of indigency, appointed counsel to represent each of them in these proceedings. Inasmuch as all three actions involved a common question of law and closely related facts, and upon the motion of defendant, the Court ordered a consolidation of the lawsuits pursuant to Rule 42(a), Fed.R.Civ.P. *See* Ellerman Lines, Ltd. v. Atlantic & Gulf Stevedores, Inc., 339 F.2d 673 (3d Cir. 1964), cert. denied, 382 U.S. 812, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). Similarly, in order to avoid an unnecessary complication of issues at the evidentiary hearing and to advance judicial expedition and economy, the Court ordered that the counterclaims of defendant be severed pursuant to Rule 42(b), Fed.R.Civ.P. *See* Big Cola Corp. v. World Bottling Co., 134 F. 2d 718 (6th Cir. 1943).

As a final preliminary matter, the Court denied defendant's motion or application, prior to the evidentiary hearing, to proceed in forma pauperis in defense of these lawsuits pursuant to 28

U.S.C. § 1915. However, at the time of the hearing defendant submitted a second in forma pauperis application. The second application was predicated on the alleged basis that a material change in defendant's financial status had recently occurred, primarily the added cost of supporting her newly acquired husband, Fred A. Cruz, meriting reconsideration of the application.

█ In order to properly resolve the propriety of defendant's application for leave to proceed in forma pauperis, it is necessary to survey the applicable law in some depth. The in forma pauperis statute provides that a trial court "may authorize the commencement, prosecution or defense of any suit . . . without prepayment of fees and costs . . . by a person who makes affidavit that he is unable to pay such costs . . . ." 28 U.S.C. § 1915. It is clear that this statute does not create an absolute right to proceed in civil actions without payment of costs. To the contrary, the statute conveys only a privilege to those unable to pay costs without undue hardships. Startti v. United States, 415 F.2d 1115 (5th Cir. 1969).

In Adkins v. E. I. DuPont de Nemours & Co., 335 U.S. 331, 339, 69 S.Ct. 85, 89, 93 L.Ed. 43 (1948), it was stated that a proper showing of poverty, as required by the statute, had been made if "one cannot because of his poverty 'pay or give security for the costs . . . and still be able to provide' himself and dependents 'with the necessities of life.'" The court then elaborated on this principle as follows:

> To say that no persons are entitled to the statute's benefits until they have sworn to contribute to payment of costs, the last dollar they have or can get, and thus make themselves and their dependents wholly destitute, would be to construe the statute in a way that would throw its beneficiaries into the category of public charges. The public would not be profited if relieved of paying costs of a particular litigation only to have imposed on it

the expense of supporting the person thereby made an object of public support. Nor does the result seem more desirable if the effect of this statutory interpretation is to force a litigant to abandon what may be a meritorious claim in order to spare himself complete destitution. We think a construction of the statute achieving such consequences is an inadmissible one.

335 U.S. at 339-340, 69 S.Ct. at 89. Similarly, in Evensky v. Wright, 45 F.R.D. 506, 507-508 (N.D.Miss.1968), it was stated that:

> The privilege of proceeding in forma pauperis should not be reserved for those that are destitute, nor should a man be forced to go hungry to maintain his suit. But something more than the mere statement and an affidavit that a man is "poor" should be required before a claimant is allowed to proceed in forma pauperis
> . . . .

It is readily apparent that there are no "magic formulas" for making the determination that the requisite in forma pauperis status is present, but instead, there is required a careful scrutiny and weighing of all of the relevant facts and circumstances involved in each particular situation.

█ In order to preclude fraudulent or careless motions of poverty, the applicant moving for in forma pauperis status should state "with some particularity, definiteness and certainty" the facts as to his poverty. Jefferson v. United States, 277 F.2d 723, 725 (9th Cir.), cert. denied, 364 U.S. 896, 81 S.Ct. 227, 5 L.Ed.2d 190 (1960). Further, when the totality of the circumstances involved are weighed against the applicant's statement of poverty, and the result suggests incongruity, the Court may go beyond the mere statement of income and inquire into additional relevant matters including the applicant's earning capacity and ability. In Roberts v. I–T–E Circuit Breaker Co., 316 F.Supp. 133, 134 (D.C.Minn.1970), the court in deny-

ing a motion to proceed in forma pauperis indicated that:

> There is something incongruous in an application by one who has earned as much as did plaintiff during his last five years of employment and who claims now he is unable to earn anything. . . . His earning ability and capacity in the court's opinion should be sufficient to enable him, if he is sincere in his belief, to garner sufficient earnings to finance the cost of his appeal.

*See* Carroll v. United States, 320 F. Supp. 581 (S.D.Tex.1970). *See generally*, 6 Moore's Federal Practice ¶ 54.74 (2d Ed. 1971).

■ Defendant, who is a lawyer and who was represented at the hearing by six lawyer-members of the American Civil Liberties Union, claims that she is unable, without undue hardship, to pay the costs to defend these lawsuits. The financial information supplied to the Court by defendant reflects that she had a gross income in 1970 of $11,902.32 and a gross income in 1971 of $4,608.55. Prior to trial, and at the time of the first application for leave to proceed in forma pauperis, defendant represented that she had a net income of $297.12 per month as a VISTA lawyer. At trial, and at the time of the second application, defendant represented that she would receive a gross income of $400 per month as a Harris County Legal Assistance, Inc. lawyer. It was further represented that her husband, Fred A. Cruz, had received $240 in income for the immediately preceding six weeks period from the NAACP Legal Defense and Educational Fund, Inc. In view of the fact that the costs, as the Court sees them, are insubstantial and in view of the defendant's statement of income, professional status, broad legal educational background and resources to secure sufficient funds to defend these ac-

tions without apparent undue hardship, the second motion to proceed in forma pauperis is also denied.[1]

### D.

### THE MOTIONS TO DISMISS AND THE COUNTERVAILING NEED FOR DEVELOPMENT OF THE FACTS

Defendant urged repeatedly with unusual vigor that these causes be summarily dismissed prior to evidentiary hearing for lack of jurisdiction over the subject matter and/or for failure to state a claim upon which relief can be granted pursuant to Rule 12(b), Fed.R. Civ.P. This court denied the motion in each instance. At that time the Court felt that the posture of the jurisdictional facts was far from clear. The very nature of the subject matter as well as the highly disciplined, closed and secretive atmosphere characteristic of penal institutions compounded the need for clarification of the factual issues in these highly unusual lawsuits. Clearly, the jurisdictional facts remained in issue as amplified through the extensive pretrial memoranda.

■ The Court's ruling to postpone ultimate decision on the jurisdictional issues until after the evidentiary facts were examined following the hearing was premised on several considerations. With regard to defendant's motion to dismiss for lack of jurisdiction over the subject matter, it appeared obvious to the Court that the jurisdictional issues were inevitably interwoven with the merits of the lawsuits. Accordingly, the proper solution was to defer decision on the jurisdictional issues until after an evidentiary hearing. *See* Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); McBeath v. Inter-American Citizens for Decency Committee, 374 F.2d 359 (5th Cir.), cert. denied, 389 U. S. 896, 88 S.Ct. 816, 19 L.Ed.2d 214

---

1. Defendant's testimony at the trial supplemented the above. She was employed at Texas Southern University Legal Aid Clinic at $13,300 a year between February, 1969 and February, 1970; she was thereafter employed at Queens Legal Services, New York at $12,500 a year between April, 1970 and February, 1971.

(1967). Considering plaintiffs' jurisdictional allegations under the Civil Rights Act, which hinge on whether or not "state action" was involved, the Court's decision was particularly appropriate in view of the United States Supreme Court's recent ruling in a case involving the civil right against discrimination wherein it was stated that:

> While the principle is easily stated, the question of whether particular . . . conduct is private, on the one hand, or amounts to "State action," on the other hand, frequently admits of no easy answer. "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance."

Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627, 637 (1972).

With regard to defendant's motion to dismiss for failure to state a claim upon which relief can be granted, the oft-cited and frequently relied upon principle is that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). See Singleton v. Foreman, 435 F.2d 962, 968 (5th Cir. 1970). Again the peculiarities of the highly unusual situation of the plaintiffs and their allegations under the Civil Rights Act compel caution. The law dictates that a petition allegedly setting forth a cause of action under the Civil Rights Act should not be dealt with cavalierly and summarily dismissed prior to giving the petitioner "the opportunity to offer supporting evidence." Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652, 654 (1972). The United States Supreme Court recently stated with regard to petitions of state prisoners that:

> Federal courts sit not to supervise prisons but to enforce the constitutional rights of all "persons" which include prisoners. We are not un-

mindful that prison officials must be accorded latitude in the administration of prison affairs, and that prisoners necessarily are subject to appropriate rules and regulations. But persons in prison, like other individuals, have the right to petition the Government for redress of grievances which, of course, includes "access of prisoners to the courts for the purpose of presenting their complaints."

Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263, 267 (1972). See Williams v. Wainwright, 461 F.2d 1080 (5th Cir. 1972); Campbell v. Beto, 460 F.2d 765 (5th Cir. 1972).

E.

## THE JURISDICTIONAL ISSUES

1.

### CIVIL RIGHTS ACT OF 1871

These consolidated lawsuits present an issue of first impression. It is whether or not a VISTA lawyer allegedly acting in combination with certain inmates and through the unwitting acquiescence or response of prison officials and employees to engage in constitutionally deprivative practices within the confines of a penal institution is empowered with sufficient state vested authority to be deemed to be acting under color of State statute, regulation, custom or usage within the meaning of the Civil Rights Act. The very nature of the rigidly controlled, closed and secretive atmosphere often found in penal institutions compounds the difficulty of "sifting facts and weighing circumstances" in order to make this jurisdictional determination. See Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). There is a paucity of reported cases in which factual situations closely akin to those found in these lawsuits have been presented to courts for scrutiny. It is clear that the Civil Rights Act is inapplicable to private parties not acting against a backdrop of state compulsion or involvement, unless their activities result in a deprivation of

protectable rights through a complete breakdown of state law or its enforcement.

Historically, the Civil Rights Act of 1871 included in its formal title the following purpose: "An Act to enforce the provisions of the Fourteenth Amendment to the Constitution of the United States, and for other purposes." 17 Stat. 13 (1871). As a result of a prolific volume of litigation in recent years, this seemingly shapeless Act has acquired some definitive guidelines and limits. A cursory examination of section one, 42 U.S.C. § 1983,[2] and its related provision section two, 42 U.S.C. § 1985(3),[3] of the Civil Rights Act of 1871 reflect that its ultimate purpose was, simply stated, to interpose the federal courts between the states and the people and thereby insure that the Fourteenth Amendment rights remained unabridged by the misuse of power or authority possessed by virtue of state law. The legislatures recognized that a backdrop of state compulsion or involvement can color private actions disproportionately with the result that such actions become as forceful and compelling as the laws of the state. In an attempt to cope with this potential loophole in the statutory scheme, section 1983 of the Act was expressly applied to "[e]very person who, [acts] under color of any statute, ordinance, regulation, custom, or usage, of any State". In a further attempt to preclude indirect modes of activity from being employed to abridge the rights sought so forcefully to be protected and as a correlative provision to the latter section, section 1985(3) related to the conduct of two or more wholly private persons acting in concert to abridge Fourteenth Amendment rights with such overriding effect that the state was either unwilling or unable to cope with it. This includes the situation in which private action results in a complete breakdown of state law and the law of conspirators becomes, with regard to the rights sought to be protected, the law of the state. *See* Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Lynch v. Household Finance Corp., 405 U.S. 538, 92 S. Ct. 1113, 31 L.Ed.2d 424 (1972); Griffin v. Breckenridge, 403 U.S. 88, 91 S. Ct. 1790, 29 L.Ed.2d 338 (1971); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Baldwin v. Morgan, 251 F.2d 780 (5th Cir. 1958).

2. The statute provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

3. The statute provides that:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

The requisites for establishing a cause of action under section 1983 were succinctly delineated in Adickes v. S. H. Kress & Co., 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970), as follows:

The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him *of a right secured by the "Constitution and laws"* of the United States. Second, the plaintiff must show that the defendant deprived him of this constitutional right "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." This second element requires that the plaintiff show that the defendant acted "under color of law."

Considering initially the second prerequisite for recovery under section 1983 according to *Adickes*, there generally is no question as to a person's acting "under color of law" when that person is an official or agent of the state and is duly acting within his vested authority. However, not infrequently when the actions of private persons are under scrutiny, the involvement of the state is not immediately apparent, and the issue of state action in a particular factual situation can be resolved, as previously indicated, "[o]nly by sifting facts and weighing circumstances". Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627, 637 (1972).

■ Turning to the law most closely related to the facts in these lawsuits, it is obvious that the issuance of a license to a person does not color that person's activities, without more, to establish state action. In Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), it was held that a state's licensing of a private club to dispense liquor does not render the club's otherwise violative discriminatory guest policies by the Equal Protection Clause "state action". The Court clearly indicated that:

The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State, or if it is subject to state regulation in any degree whatever. Since state-furnished services include such necessities of life as electricity, water, and police and fire protection, such a holding would utterly emasculate the distinction between private as distinguished from State conduct set forth in The Civil Rights Cases, supra, and adhered to in subsequent decisions. Our holdings indicate that where the impetus for the discrimination is private, the State must have "significantly involved itself with invidious discriminations," . . . in order for the discriminatory action to fall within the ambit of the constitutional prohibition.

407 U.S. at 173, 92 S.Ct. at 1971, 32 L. Ed. at 637 (citations omitted). It follows that the mere fact that a person holds a license to practice law issued by a state does not render that person's actions those of the state. Skolnick v. Martin, 317 F.2d 855 (7th Cir. 1963). Further, the fact that the attorney is appointed by the court to represent a litigant does not alter the private nature of his actions. Mulligan v. Schlachter, 389 F.2d 231 (6th Cir. 1968); *see* Schack v. Starr, 440 F.2d 378 (5th Cir. 1971). Additionally, a legal aid lawyer or public defender is not vested with state authority, even though the organization involved is financed wholly or in part by state funds. Peake v. County of Philadelphia, Pa., 280 F.Supp. 853 (E.D.Pa.1968); Pugliano v. Staziak, 231 F.Supp. 347 (W.D.Pa.1964), aff'd, 345 F.2d 797 (3d Cir. 1965). Similarly, the issuance of a permit from the state to do an innocuous act which can be supplemented by private action to deprive another of basic rights does not create state action in the recipient. Guthrie v. Alabama By-Products Co., 328 F.Supp. 1140 (N.D.Ala.1971).

Plaintiffs specifically contend that defendant was empowered with state action as a result of her availing herself of regulations of the TDC, and her securing the unwitting acquiescence or response of TDC officials, which permitted her to obtain unlimited access to her inmate-clients as an attorney. This theory falls short of its intended mark when compared to the theory offered and decisively rejected in the *Moose Lodge* decision. With regard to the prospects of the regulations of a state agency sufficiently coloring private actions to establish "state action" the Court in *Moose Lodge* concluded that:

> However detailed this type of regulation may be in some particulars, it cannot be said to in any way foster or encourage racial discrimination. Nor can it be said to make the State in any realistic sense a partner or even a joint venturer in the club's enterprise.

407 U.S. at 176–77, 92 S.Ct. at 1973, 32 L.Ed.2d at 639. The prison regulations obviously fail to encourage or foster the alleged conspiratorial activities of defendant within the prison system. The only remaining question in this regard, as stated in *Moose Lodge*, is whether or not the involvement of the State was such as to render it "a partner or . . . joint venturer in . . . [defendant's] enterprise." 407 U.S. at 177, 92 S.Ct. at 1973, 32 L.Ed.2d at 639. Clearly concerted action, or closely intertwined conduct, of private parties and state officials establishes sufficient state involvement to satisfy the jurisdictional requisites. Smith v. Young Men's Christian Ass'n of Montgomery, Inc., 462 F.2d 634 (5th Cir. 1972); Fulton v. Emerson Electric Co., 420 F.2d 527 (5th Cir. 1969), cert. denied, 398 U.S. 903, 90 S.Ct. 1689, 26 L.Ed.2d 61 (1970). However, in view of the evidence ultimately forthcoming at the hearing in these causes, it is apparent that the unwitting acquiescence or response of the TDC officials under these circumstances was not tantamount to concerted action related to defendant's alleged conduct as a conspirator. Similarly, any action taken by TDC officials and employees to counteract defendant's alleged conspiracy would not under these facts suffice to create "color of state law", even though plaintiffs may have been deprived of a protectable right as a result. Accordingly, the facts as fully developed at the hearing compel the conclusion that plaintiffs' efforts to bring an action under 42 U.S.C. § 1983 must fail.

Finding a lack of direct state involvement sufficient to demonstrate state action under section 1983, the next step is to test the sufficiency of the indirect state involvement coupled with the interrelated issue of the sufficiency of the deprivative wrong involved so as to confer jurisdiction under section 1985(3). As has been pointed out heretofore, this section relates to purely private conspiracies. Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). However, this section was not intended to confer federal remedies for all private conspiracies having the effect of depriving others of constitutionally vested rights. 403 U.S. at 101–102, 91 S.Ct. 1790. In Dombrowski v. Dowling, 459 F.2d 190, 195 (7th Cir. 1972), it was properly indicated that:

> The breadth of the statute's coverage is yet to be determined, but three categories of protected rights have been plainly identified. *Griffin* gives express recognition to a black citizen's Thirteenth Amendment rights and to his federal right to travel interstate; the title of the statute expressly identifies the third category, namely, rights protected by the Fourteenth Amendment. We think the § 1983 cases make it clear that in this third category a "state involvement" requirement must survive *Griffin*.

The Court concluded that:

> Since the Fourteenth Amendment, unlike the Thirteenth, affords the plaintiff no protection against discrimination in which there is no state involvement of any kind, a private

conspiracy which arbitrarily denies him access to private property does not abridge his Fourteenth Amendment rights. 459 F.2d at 196. *But see* Action v. Gannon, 450 F.2d 1227 (8th Cir. 1971). It is also clear that a private conspiracy to violate a federal statute is actionable under this section. *See* Hayes v. United States, 464 F.2d 1252 (5th Cir. 1972). This, of course, would include a conspiracy to violate section 1983 of the Civil Rights Act. Birnbaum v. Trussell, 371 F.2d 672 (2d Cir. 1966). Obviously, the deprivative practices outlawed by section 1985(3) pertain to racial or other class-based conduct aimed at a denial of the equal enjoyment of basic rights. Having determined that the interests protectable from private conspiracies are not presented in the facts of these consolidated actions, this Court necessarily concludes that section 1985(3) is of no avail to plaintiffs.

2.

### DIVERSITY OF CITIZENSHIP UNDER 28 U.S.C. § 1332

Plaintiffs Dreyer and Slayman contend that they have viable causes of action under this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) since the diversity requisites are satisfied and Texas law confers a remedy for the rights sought to be protected. It is asserted that there is complete diversity of citizenship and that the value of the right sought to be protected exceeds the jurisdictional amount. These plaintiffs claim to be bona fide citizens of states other than Texas, even though presently incarcerated in a Texas prison.

It is basic to federal jurisdiction that trial courts have jurisdiction over "civil actions where the matter in controversy exceeds the sum or value of $10,000" and is between citizens of different states. 28 U.S.C. § 1332(a). Citizenship in a state, within the meaning of the latter provision, requires more than mere residency. It is the domicile of a person that is controlling.

Domicile is the place where a person has his permanent place of abode and to which he has the intention of returning whenever absent therefrom. Stine v. Moore, 213 F.2d 446 (5th Cir. 1954). It appears clear that an otherwise non-citizen of a state does not acquire a domicile, and hence citizenship, in a state merely because he happens to be incarcerated in that state. This is necessarily true, since there would be a total absence of intention or free choice to remain in the incarcerated state. H. Goodrich & E. Scoles, Handbook of the Conflict of Laws 46 (4th Ed.1964); *see* Eddings v. Pennsylvania, 311 F.Supp. 944 (E.D.Pa.1970); Hardy v. De Leon, 5 Tex. 211 (1849). From the evidence forthcoming at the trial, it appears that plaintiff Dreyer is a citizen of the state of Kansas and that plaintiff Slayman is a citizen of the state of Michigan.

In order to establish jurisdiction, however, plaintiffs must also demonstrate that the amount in controversy exceeds the $10,000 jurisdictional minimum. This determination is to be made by federal standards, although the nature and extent of the rights sought to be protected are a matter of state law. Johns-Manville Sales Corp. v. Mitchell Enterprises, Inc., 417 F.2d 129 (5th Cir. 1969).

In actions seeking injunctive relief the amount in controversy is measured by the value of the right to be protected or the value of the object to be gained. Fletcher v. Gerlach, 7 F.R.D. 616 (S.D.N.Y.1947); *see* Annot., 30 A.L.R.2d 602 (1953). The burden of proof in this regard is upon the plaintiff. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). Absolute certainty in valuation of the right involved is not required, and a reasonable probability of an amount in controversy exceeding the jurisdictional amount suffices if the amount can be ascertained pursuant to some realistic formula. Berk v. Laird, 429 F.2d 302 (2d Cir. 1970), cert. denied, Orlando v. Laird, 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113 (1971);

Friedman v. International Association of Machinists, 220 F.2d 808 (D.C. Cir.), cert. denied, 350 U.S. 824, 76 S.Ct. 51, 100 L.Ed. 736 (1955). In the *Berk* case the plaintiff, an Army private, sought injunctive relief precluding his dispatch to Vietnam asserting jurisdiction under 28 U.S.C. § 1331(a). The court noted that the jurisdictional allegations were challenged but then concluded that "the complaint can be construed as putting in controversy his future earning capacity, which serious injury or even death might diminish by an amount exceeding $10,000." 429 F.2d at 306. However, if the matter in dispute is of a nature that is incapable of valuation in pecuniary terms, then the requisite amount in controversy cannot be demonstrated and, hence, diversity jurisdiction is lacking. Goldsmith v. Sutherland, 426 F.2d 1395 (6th Cir.), cert. denied, 400 U.S. 960, 91 S.Ct. 353, 27 L.Ed.2d 270 (1970).

■ Whatever may be the proper method of objectively ascertaining and demonstrating the presence of the requisite amounts in controversy in these cases, plaintiffs have not seriously attempted to develop and prove it. Accordingly, with this essential requisite of federal diversity jurisdiction lacking, this Court must conclude that viable causes of action under 28 U.S.C. § 1332(a) have not been advanced by these plaintiffs.

### 3.

### PENDENT JURISDICTION

■ Plaintiffs next contend that this Court has pendent jurisdiction to issue appropriate injunctive relief in accord with Texas law. It is fundamental that where federal and nonfederal grounds for relief "derive from a common nucleus of operative facts" and are joined in a single cause of action the federal court has full jurisdiction to hear both claims. Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Anderson v. Nosser, 438 F.2d 183 (5th Cir. 1971),

modified, 456 F.2d 835 (5th Cir. 1972); Whirl v. Kern, 407 F.2d 781, 793 (5th Cir.), cert. denied, 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969). *See* 1 W. Barron & A. Holtzoff, Federal Practice and Procedure § 23 (Wright Ed.1961). If the federal claim is not plainly wanting in substance, then the ultimate disposition of the federal claim is immaterial. Hurn v. Oursler, *supra*; Roberts v. Williams, 456 F.2d 819 (5th Cir. 1971); Brown & Root, Inc. v. Gifford-Hill & Co., 319 F.2d 65 (5th Cir. 1963); Strachman v. Palmer, 177 F.2d 427 (1st Cir. 1949); Sauls v. Hutto, 304 F.Supp. 124 (E.D.La.1969); Annot., 5 A.L.R.3d 1040 (1966); Annot., 12 A.L.R.2d 695 (1950). In fact, even if the federal claim is dismissed prior to trial, the trial court still has discretion, to be exercised in the interest of judicial economy, convenience and fairness to litigants, to hear and decide the merits of the state claim. Gem Corrugated Box Corp. v. National Kraft Container Corp., 427 F.2d 499 (2d Cir. 1970); Rogers v. Valentine, 426 F.2d 1361 (2d Cir. 1970).

It is apparent that plaintiffs have alleged a substantial federal claim which was not plainly wanting in substance, but which ultimately dissipated only after the facts were distilled through the mass of proof presented at the trial. Accordingly, this Court has the discretion to hear and consider any valid state claim which arises out of the same common nucleus of operative facts as the federal claim and to dispose of the case upon the non-federal ground. United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

■ Turning now to the applicable Texas law, the Texas general injunctive statute, Tex.Rev.Civ.Stat.Ann. art. 4642, authorizes relief "[w]here the applicant is entitled to the relief demanded and such relief or any part thereof requires the restraint of some act prejudicial to him." This statutory provision sanctions injunctive relief to protect both property and personal rights. Passel v. Fort Worth Independent School District,

440 S.W.2d 61 (Tex.1969). Various Texas courts have couched the personal rights to be protected in terms of "natural or contractual rights", "basic civil rights" and "unalienable rights." Hotel & Restaurant Employees' International Alliance & Bartenders' International League of America v. Longley, 160 S. W.2d 124 (Tex.Civ.App.—Eastland 1942, no writ); McMorries v. Hudson Sales Corp., 233 S.W.2d 938 (Tex.Civ.App.— El Paso 1950, no writ); Sims v. University Interscholastic League, 111 S.W.2d 814 (Tex.Civ.App.—Beaumont 1937), vacated on other grounds, 133 Tex. 605, 131 S.W.2d 94 (Tex.Comm'n App. 1939).

 It is a fundamental principle, however, that injunctive relief will not issue to restrain the commission of a tort unless irreparable injury will result for which the recovery of damages is an inadequate remedy. *See* Hawks v. Yancey, 265 S.W. 233 (Tex.Civ.App.—Dallas 1924, no writ); 4 J. Pomeroy, A Treatise on Equity Jurisprudence § 1347 (5th Ed.1941); Restatement of Torts §§ 933–43 (1939); Annot., 175 A.L.R. 438 (1948); *see also* Pound, Equitable Relief Against Defamation and Injuries to Personality, 29 Harv.L.Rev. 640 (1916); Long, Equitable Jurisdiction to Protect Personal Rights, 33 Yale L.J. 115 (1924). Texas courts also adhere to the principle that "a private individual cannot maintain a suit to enjoin the violation of a penal law, unless such violation results in damage to such person, peculiar to him, and not common to the public in general." Woods v. Kiersky, 14 S.W.2d 825, 828 (Tex.Comm'n App. 1929). The governing policy consideration is that the criminal prosecution process should not be interfered with by equity when that process affords an adequate remedy. The notable exception to this rule is that if the party in question is imminently threatened with an irreparable injury which is peculiar to him and for which there is no adequate remedy, then equity will not leave him remediless. Kostoff v. Harris, 266 S.W.2d 204 (Tex.Civ.App.—Dallas, writ ref'd n. r. e.).

Injunctions have been issued to preclude repeated or continuous physical assaults and slanderous conduct which are of a peculiar and irreparable nature and for which the aggrieved party had no adequate remedy. Hawks v. Yancey, 265 S.W. 233 (Tex.Civ.App.—Dallas 1924, no writ); Ex parte Warfield, 40 Tex.Cr.R. 413, 50 S.W. 933 (1899); Hunt v. Hudgins, 168 S.W.2d 703 (Tex.Civ.App.— Waco 1943, no writ). Equity has also protected "the exercise of natural and contractual rights from interference by attempts at intimidation or coercion." McMorries v. Hudson Sales Corp., 233 S.W.2d 938, 942 (Tex.Civ.App.—El Paso 1950, no writ). The latter court clearly indicated that "[v]erbal or written threats may assume that character; [and] when they do they amount to conduct or threatened conduct, and . . . may properly be restrained." 233 S.W.2d at 942.

 As indicated heretofore, basic civil rights are within the ambit of personal rights to be protected. Thus, a student of a school or a member of an association has a cause of action and a commensurate injunctive remedy against the association or individual dealing with him when the actions of the association or individual result in deprivation of "a valuable civil right." Sims v. University Interscholastic League, 111 S.W.2d 814 (Tex.Civ.App.—Beaumont 1937), vacated on other grounds, 133 Tex. 605, 131 S.W.2d 94 (Tex.Comm'n App.1939). Similarly, injunctive relief is appropriate to preclude third-party interference detrimental to an attorney-client relationship. Stuessy v. Byrd, Davis and Eisenberg, 381 S.W.2d 126 (Tex.Civ.App.—Austin 1964, no writ).

Peculiar to the situation of the plaintiffs in these lawsuits is the fact that they are confined within a rigidly controlled, closed penal institution highly regulated by statute. This statutory scheme not only regulates prison practices and conditions, but also confers upon inmates certain rights and privileges. Basically, the statute provides that "those convicted of violating the

law and sentenced to a term in the [Texas Department of Corrections] shall have humane treatment, and be given opportunity, encouragement and training in the matter of reformation." Tex.Rev.Civ.Stat.Ann. art. 6166a. While the control of the prison system is vested in the Texas Board of Corrections, the Director has "power to prescribe reasonable rules and regulations governing the humane treatment, training and discipline of prisoners . . . ." Tex.Rev.Civ.Stat.Ann. arts. 6166g, 6166j. Further, the Texas statute provides for the admission of visitors into the penitentiary, including attorneys, "under such rules and regulations as may be established" by the Director. Tex.Rev.Civ.Stat.Ann. art. 6166z2.

Specifically with regard to the rights and privileges of inmates in the TDC, provision is made for commutation of sentence, commonly referred to as "good time", for "orderly, industrious and obedient" conduct. Tex.Rev.Civ.Stat.Ann. arts. 6166v, 6184*l*. Further, an inmate with "a good prison record" can, additionally, be appointed to a position of prison trusty and receive special privileges. Tex.Rev.Civ.Stat.Ann. art. 6184a.

Plaintiffs allege continuous and repeated assaults, intimidation and harassment as a consequence of their refusal to sign fictitious statements and to give fictitious testimony, such intimidation stemming from the actions of defendant as well as her recalcitrant inmate-clients and through the unwitting acquiescence or response of prison officials or employees in enforcing the TDC regulations, particularly those regulating attorney visitations with inmates. All of this alleged conduct took place within the confines of an essentially closed, highly disciplined state institution established and maintained for the incarceration and rehabilitation of prisoners. Allegations have also been made of interrelated fights and incidents precipitated by defendant or her co-conspirators which are readily construed by prison officials as incorrigible conduct in violation of prison regulations, thereby setting in motion certain institutional disciplinary procedures against plaintiffs with a potential loss of prison rights and privileges including statutory commutation time.

██ Accordingly, irreparable injury as well as lack of an adequate non-equitable remedy as to these plaintiffs seem apparent in this unusual fact situation occurring within a state prison. Under these circumstances this Court can only conclude that if the allegations presented in the complaints are factually supportable, then Texas law would not leave plaintiffs remediless, and that in making such a determination this Court is proper in acting within its discretion to exercise pendent jurisdiction in these consolidated cases.

## II.

## THE COMMENCEMENT OF THE ALLEGED CONSPIRACY THROUGH THE ALLIANCE OF DEFENDANT AND INMATE FRED CRUZ

### A.

### BACKGROUND OF DEFENDANT

It is impossible to understand the development of this case without having some factual data concerning the background of the defendant, Mrs. Frances Freeman Jalet Cruz. A woman of extensive education, she holds liberal arts degrees from Radcliffe College and Columbia Teachers College and law degrees from Columbia University Law School and Georgetown University Law School. After working in New York State in various capacities which exposed her to social problems involving the poor, she joined the New York State Law Revision Commission in 1959 and remained until 1967. She then evidenced interest, applied for and obtained acceptance at the age of 57 as a candidate for Fellow in the Reginald Heber Smith Foundation program for the training of lawyers in the fields of poverty law, landlord-tenant law, juvenile courts and administrative agency rulings. She was a member of the initial class of this program which

was given at the University of Pennsylvania Law School under the direction of a Professor Howard Lesnick. Upon the defendant's successful completion of the six week course, she was assigned to the Legal Aid and Defender Society (LADS) of Travis County at Austin, Texas in September, 1967. Although the defendant possessed a law degree, she did not have a Texas law license. Accordingly, she was assigned work as a staff assistant in the Austin program until licensed in March, 1968. Inasmuch as her salary was assumed and paid for by the Foundation under a contract with the Austin project, she was viewed as a welcome addition to its understaffed legal aid force.

Problems arose soon after her arrival in Texas. The guidelines and scope of operation of the LADS office were somewhat imprecise and conflicting. The "Reggie" program ostensibly followed guidelines of the Office of Economic Opportunities (OEO) which had its headquarters in Washington, D. C., whereas the local Director in charge of the Austin project sought to remain independent and shape somewhat more restricted jurisdictional guidelines as to what people the program was to reach. The situation was complicated by the fact that the Austin program, the Legal Aid and Defender's Society of Travis County, was funded through the OEO. Although there is testimony that the Austin Director made it clear to the defendant as to what the scope of her work would be, the evidence reflects that the defendant who had not as yet acquired a Texas law license was soon in contact with inmate personnel at the Texas Department of Corrections (TDC) located in Huntsville, Texas, over 100 miles away.

It would appear that the initial inmate with whom she came in contact was a prisoner named Fred Arispe Cruz. This occurred following the publication of an article in an Austin newspaper concerning the defendant entitled "Portia for the Poor" in September, 1967, shortly after she arrived. Cruz wrote to the defendant, and she thereafter commenced corresponding with him and made visits to see him at Huntsville. According to the Austin Director of the Legal Aid and Defender Society, he soon received criticism of the defendant to the effect that she was seeing and representing prisoners at the TDC without a law license. Ultimately, he concluded that the defendant violated the rules of the LADS project by (1) practicing without a license, (2) handling poverty cases outside of Austin and Travis County, Texas, and (3) handling criminal instead of civil matters to which the program was restricted. The defendant vigorously denied that the project's guidelines as she interpreted them violated any rules and certainly not those of the OEO. These differences could not be resolved. In due course the Austin Director conferred with the OEO, and arrangements were made to solve the probelm by transferring the defendant to the Dallas, Texas Legal Service Project.

One issue which was disputed at the trial was whether or not Dr. George Beto, Director of the Texas Department of Corrections, brought pressure to bear, directly or indirectly, on those in charge of the Austin project which contributed to the defendant's transfer to Dallas. Although the evidence contains some inconsistencies, this Court accepts the testimony of the Austin Director which is confirmed in substance by the Austin newspaper editor that certain of the complaints which ultimately reached him concerning the defendant's activities had originated with Dr. Beto.

A similar situation developed when the defendant commenced her work in the Dallas Legal Service Project in March, 1968. This program was also funded by the OEO, and, as in the Austin project, there was a lack of unanimity on policy between the local Director of the program and the OEO. The Dallas Director viewed the program as (1) restricted to Dallas County and (2) encompassing no criminal representation. Whatever may have been the initial un-

derstanding between the Director and the defendant as to the scope of her work in the Dallas office, a matter on which their testimony sharply differed, it is apparent from the evidence that the defendant continued her visits to the TDC. In fact, she acquired additional inmates as clients. At one point Professor Lesnick attempted by long distance telephone to arbitrate between the Dallas Director and the defendant, but the misunderstanding persisted.

In October, 1968, Dr. Beto called the Dallas Director and indicated that he was having difficulty with the defendant as a consequence of her visits to the TDC. This precipitated a memorandum by the Dallas Director to the defendant ordering her to terminate her visits to the prisoners. On the basis of receipt of a copy of this memorandum, Dr. Beto removed the defendant's name from the approved visitor list at the prison in October, 1968, thus barring her from seeing any of the inmates. In December, 1968, the defendant brought suit against the Dallas Director and Dr. Beto in State Court in Dallas County for conspiring to keep her out of the TDC. As a consequence, the defendant's employment in the Dallas project was promptly terminated on December 24, 1968.

The role of Dr. Beto in contributing to the dismissal of the defendant at Dallas is clear in this instance and is answered by his own testimony. He had suggested to the Dallas Director that such action be taken because his information from the wardens was that the defendant's activities were causing unrest in the prison units. The Director thereupon dismissed her.

After Dallas the defendant sought employment in Houston and joined the Legal Aid Clinic at Texas Southern University where she was able to continue her work with prisoners at the TDC. Dr. Beto wrote the Dean of the Law School concerning her activities, but the Dean defended her work and retained her services. The termination of her

Fellowship with the Reginald Heber Smith Foundation brought an end to her work at Texas Southern University in February, 1970. The defendant then moved to New York for a year, working for the Queens Legal Services there, but continuing to return periodically to Texas to handle certain prison cases at the TDC. In March, 1971, she took a job in Houston with VISTA, a federal agency rendering assistance to the poor, which resulted in a continuation of her work with inmates at the TDC. Shortly before the trial of this case, her employment with VISTA was terminated.

B.

## DEFENDANT'S PRISON VISITS TO THE TEXAS DEPARTMENT OF CORRECTIONS AND HER CONTACTS WITH DR. GEORGE BETO

As previously pointed out, the evidence indicates that defendant's first contact with the TDC and an inmate, Fred Arispe Cruz, came after an Austin, Texas, newspaper published a feature story on her in September, 1967. Her first impressions of the TDC and of Dr. Beto were favorable. In January, 1968, the defendant had written to Dr. Beto that her impression of the Ellis Unit was that "everything was first class".[4] She had visited only one prison in her life before coming to Texas, and she made no pretense of possessing any background in penology or prison reform. Instead, this legal area involving prisoners' rights had become a new source of interest to her. While still working in Austin, she had seen Dr. Beto on October 26, 1967, and had asked to visit other prison units. The nature of this request in addition to her other requests to visit Cruz privately and at length under special arrangements ultimately caused Dr. Beto to have misgivings about her intentions.

Matters deteriorated in the early months of 1968. When at one point she

4. Plaintiffs' Exhibit No. 42.

could not see Cruz who was held incommunicado for disciplinary reasons, she requested a copy of the prison regulations pertaining to correspondence between attorney and client. In early 1968 she wrote the Texas Board of Corrections with copy to Dr. Beto and complained about conditions experienced by inmates in solitary confinement, the absence of due process at unit disciplinary hearings and other prison procedures.[5] In March, 1968, defendant was admitted to the Texas Bar, and about that time the Austin Director took up with her the subject of her activities at the TDC. When she refused to abandon her contacts with the inmates, he arranged to terminate her work in Austin.

After her transfer to Dallas, the defendant acquired other prisoner clients at the TDC, one by federal court appointment. Her interest in this field increased, undoubtedly stimulated by her contacts with Fred Arispe Cruz. A relatively young inmate, Cruz already possessed a substantial criminal record. He had first been sent to the TDC in 1957 at the age of 18 after having been convicted of the offense of possession of marihuana. Most recently, he has completed serving a 15 year sentence at the TDC for robbery by assault. While incarcerated, Cruz had acquired some proficiency over the years in drafting and filing legal actions, one of a number who became known as "writ writers" in the prison populace. Concurrently, he had resisted prison regimen and had incurred the increasing disfavor of TDC officials including Dr. Beto. It is apparent from the evidence that the defendant and Cruz ultimately came to recognize that, in addition to a relationship of attorney and client, they shared some of the same interests with each contributing to the education of the other in understanding prison life procedures and the developing body of law pertaining to prisoners' rights.[6]

The passage of time served to increase the opposition of the defendant to the TDC, its regulations and Dr. Beto. The filing of suit by defendant against Dr. Beto and the Director of the Dallas Legal Aid Clinic, alleging a conspiracy to deprive her of access to the inmates, was but an opening foray. That suit was ultimately dismissed. Her prior correspondence reflected her increased frustrations. In a letter to Professor Lesnick, she had stated in referring to the Dallas Director and Dr. Beto, "I want so much to lash out at him or both of them and the whole prison system here."[7] Following termination of her Dallas employment, defendant had come to the Texas Southern University Legal Aid Clinic. She was a party to another lawsuit filed in federal court against Dr. Beto and the warden of the Ellis Unit of the TDC on similar grounds in January, 1969. As a consequence she was barred from seeing inmates at the TDC until that suit was dismissed in March, 1969. In November of 1971 she was barred again. Because of her many visits to the TDC and her growing prison clientele, she was prohibited from seeing any inmates except those who were her clients as of November, 1971. That is her present status. All of these inmates have now been transferred to one prison complex, the Wynne Unit, where she is able to confer with them.

## C.

### THE EXTENT OF DEFENDANT'S CONTACTS WITH AND REPRESENTATION OF INMATES AT THE TEXAS DEPARTMENT OF CORRECTIONS

The number of defendant's visits to see inmates at the Texas Department of Corrections is unparalleled and deserves some comment. According to the records of the TDC, the defendant made 583 visits to see inmates between October, 1967 and March, 1972. More spe-

---

5. Defendant's Exhibit No. 104.

6. Shortly before the evidentiary hearing in these lawsuits the defendant and Fred

Arispe Cruz who had recently been discharged from the TDC were married.

7. Plaintiffs' Exhibit No. 41.

cifically, she made 166 visits between October, 1967 and March, 1970, and she made 417 visits between March, 1970 and March, 1972. Of those visited, the defendant made seventy visits to see Fred Arispe Cruz. Without identifying the other inmates, those who were most frequently visited by the defendant were seen respectively 26, 25, 23 and 20 times during the above time span. Many others were seen a lesser number of times.

The defendant testified that she has legally assisted some 100 or more inmates, some in habeas corpus proceedings and others in civil rights suits attacking prison conditions and procedures. At one point she briefly represented one of the inmate plaintiffs, Lock, and had conferred with another, Slayman. She never had any contact with the third plaintiff, Dreyer.

Although the defendant professes that none of her clients are prone to violence to her knowledge, the personnel records of the inmates which are in evidence reflect otherwise. A large percentage of the inmates represented are recidivists who are serving long sentences for serious offenses including murder, robbery by assault, burglary, rape, and possession of narcotics among others. Many of these inmates testified for both the plaintiffs and the defendant in this case, a situation which, has created major problems for this Court in determining where the truth lies in this lawsuit. It is in such a context that the plaintiffs' charges of conspiracy against the defendant must be scrutinized and evaluated.

### 1.

### THE CHARGES OF PLAINTIFFS

In brief, three of the prison inmates, Dreyer, Slayman and Lock, have alleged that the defendant has been engaged in a conspiracy to undermine and destroy prison regulations, to create tension and chaos and to spread false rumors and confusion in and out of the prison to their detriment as they attempt to serve their sentences. It is further alleged that the defendant made an alliance with inmate Fred Arispe Cruz to carry out such a scheme on a wide-spread basis throughout much of the prison system. Allegedly assisting in the plot were other inmates recruited from various units of the TDC which the defendant was freely able to visit in her capacity as an attorney. As a result of such disruption, plaintiffs have been victims of deliberate schemes for which they have been blamed by TDC officials and for which they have suffered disciplinary action and its consequences. Plaintiffs seek an injunction to enjoin the defendant from going to the TDC to continue such activities which allegedly attack the prison system and its procedures; as the plaintiffs profess to see it, the system can successfully operate only when its code of strict rules and regulations is rigidly enforced without interference, thereby permitting an inmate to serve his sentence without incident in the minimum time permitted under such rules.

### 2.

### THE ALLEGED CONSPIRACY

If a civil conspiracy is to be proved, there must be persuasive evidence adduced that two or more individuals have been knowingly engaged over a period of time in a common purpose to accomplish unlawful objectives or to accomplish a lawful end by an unlawful means. Here the defendant and Fred Arispe Cruz constitute the principals comprising the alleged conspiratorial core with other inmates ostensibly recruited to assist through the combined efforts of both. The proof advanced by plaintiffs at the trial can be divided into two types, that evidenced by documents and that adduced from the testimony of other witnesses who allegedly participated in the conspiracy or were approached in some fashion to play a role in such a scheme. Two documents merit exposition, the "Kirby Writ Crusade" and the "Ellis Report."

The "Kirby Writ Crusade" [8] is a tract handwritten by inmate Donald Lee Kirby, a so-called "prison writ writer," which was confiscated at the Eastham Unit in July, 1971. Some fifteen pages long, the theme of the "Kirby Writ Crusade" spells out a format for processing grievances of inmates through concerted action in the courts. Plaintiffs have seized upon certain of the language in the tract as smacking of militancy and revolution. Kirby's testimony at the trial was to the effect that, while a non-conformist, he has advocated and continues to advocate militancy only in attacking existing grievances in prisons through the courts and not in creating new incidents through violence. There are references in the "Kirby Writ Crusade" to Cruz whom Kirby admires as th "Ralph Nader in the prison system". However, there is no persuasive evidence that Cruz contributed to or knew of the document, nor is there evidence presented to this Court that the "Kirby Writ Crusade" connotes some aspect of a scheme authored by anyone to use violence to overthrow the prison system. If the document reflects anything more than one inmate's strong convictions, whether right or wrong, that more civil rights lawsuits should be filed by inmates against the TDC, it was not convincingly demonstrated by the evidence.

The second document is the "Ellis Report" [9] which the defendant wrote in the Fall of 1968 while still employed at the Dallas Legal Services office. This report consisting of fifteen typewritten pages is a description and indictment of the TDC with reference to its methods of disciplining inmates and its prison conditions. It was ostensibly written by the defendant for distribution to various agencies which might be interested in taking action to correct such alleged practices and conditions. Plaintiffs have attacked the document as a figment of defendant's imagination, since it was obviously written without firsthand knowledge on her part. Also the theory is advanced that the "Ellis Report" is deliberately disseminated as a part of a major scheme to discredit, distort and undermine the procedures at the TDC. Defendant has countered by testifying that the "Ellis Report" is a compilation of firsthand information from former inmates including Cruz who supplied her with such detailed information. There have been exhibits introduced into evidence as well as testimony which serve to confirm such sources of information from which defendant could prepare such a document as the "Ellis Report".[10] This does not mean to say that the Court necessarily believes the contents of the document to be accurate; it does mean that the evidence supports the defendant's version as to how it was written and that the Court can find no persuasive proof of conspiracy from its contents.

The actual testimony of plaintiffs' witnesses as to a conspiracy in this case can only be viewed as resting on tenuous grounds. In large measure such testimony from inmates is contradictory, confusing and revolves around incidents, mostly fights or exchanges between inmates, sometimes involving prison personnel, which are susceptible to multiple interpretations. Many of such events appear to this Court to be completely unrelated to the issues or the parties involved in this lawsuit. Plaintiffs would have the Court believe that the inferences to be drawn from such incidents meld together so as to portray the distinct outlines of a major plot or conspiracy to overturn by violent means the prison system, its rules and regulations. This Court has considered very carefully this particular contention and has heard deliberately every fragment of evidence from inmates and other witnesses which might bear on the point. No conspiracy has emerged. Apart

---

8. Plaintiffs' Exhibit No. 7.

9. Defendant's Exhibit No. 14.

10. Defendant's Exhibit Nos. 86, 131, 132.

from serious problems in determining credibility of the inmate witnesses on both sides, this much does stand out: The defendant and the authorities at the TDC have become bitter antagonists over an extended period of time because the defendant represents some recidivist, recalcitrant inmates for whom lawsuits have been filed attacking the conditions, procedures, rules and regulations of the prison system.

This Court closely followed the testimony of the three wardens, McAdams of the Wynne Unit, Cousins of the Ellis Unit and McMillan of the Eastham Unit, since they obviously should be in the most advantageous position to pinpoint and assess the step by step development of any conspiracy at the TDC involving the defendant, Cruz and other inmates. This source of proof which is significantly lacking in specifics does not require any detailed narration of incidents. Instead, a broad, general picture is painted. Defendant is characterized as a troublemaker who opposes certain of the TDC disciplines and procedures and who has persisted in filing lawsuits on behalf of inmates challenging such practices. Cruz is described as belligerent and an instigator of disruption among the inmates by his encouragement of other inmates to file frequent "writs" in court attacking prison procedures and conditions. It is apparent that these so-called "writ writers" are strongly resented by those at the TDC, inasmuch as they challenge the status quo.

Because the defendant represents many of these inmates, it is urged that she and Cruz have vigorously recruited such inmates to file suits against the TDC, thereby exposing her to potential charges of unprofessional conduct. While this is more properly an issue for a grievance committee, any such charge will undoubtedly be vigorously opposed. It goes without saying that there is a paucity of attorneys who devote any significant amount of time to the representation of prisoners, most of whom are without funds to employ legal counsel. Consequently, inmates serving long prison terms for the commission of serious crimes need no encouragement to take advantage of any and all available avenues to secure their release or to better their lot, particularly when the evidence indicates that defendant's services have been rendered almost without exception on a legal aid basis.

When Dr. Beto concluded his testimony, he stated very candidly that while he thought the defendant was connected with some illegal activity, he could not prove it. After a studied review of all of the evidence forthcoming in this lengthy trial, this Court must concur that there is no convincing proof of illegal activity on the part of the defendant and certainly none that can satisfy the legal requisites of a conspiracy. Consider as well the available evidence forthcoming from the inmate plaintiffs. Dreyer never knew the defendant and actually contributed no helpful testimony which pointed toward her involvement in a conspiracy. Slayman was present at the trial only for the first three days and then, having been paroled only a short time before from the TDC, he mysteriously disappeared. His deposition testimony was admitted into evidence during the six week trial before the Court. In the light of his unexplained absence and failure to testify, his testimony has been largely discounted by the Court. Plaintiff Lock testified twice, first as a plaintiff and then, strangely, at his specific request in support of the defendant. Such bizarre behavior on the part of Lock compels this Court to scrutinize very closely all of his testimony and to rely upon it, if at all, only when other factors or the testimony of other witnesses serve to corroborate his version of the facts.

When all of the proof presented by the plaintiffs is considered, this Court can only conclude that they have not proved by a preponderance of the evidence that the defendant engaged in a conspiracy.

## III.

### EXAMINATION OF THE ALLEGED INTOLERABLE PRISON PROCEDURES AND CONDITIONS WHICH DEFENDANT SEEKS TO OUTLAW

This Court having already found that defendant did not engage in a conspiracy, it would be entirely in order to terminate this opinion at this point. However, at the risk of prolonging its length unduly, this Court feels warranted in going further, albeit in dicta, in order to reflect the full impact of the testimony forthcoming at this lengthy trial. Over sixty witnesses testified, forty-seven of them being inmates or ex-inmates of the Texas Department of Corrections. Of these inmates, thirteen testified for the plaintiffs and thirty-four for the defendant excluding the second appearance of plaintiff Lock as a witness, this time for the defense.

In defending against the plaintiffs' charges of conspiracy, the defendant vigorously stressed that her relationships with the inmates at the TDC were only lawful ones and that her efforts were to expose and to eliminate by legal means the prison procedures and conditions which violated the individual inmate's legal rights. While the evidence which poured forth is in sharp conflict as to what procedures are followed and what conditions actually exist at the TDC, such evidence can serve the purpose of spotlighting certain aspects of a way of life little known to those in the "free world" as well as relating such irreconcilable factual accounts to the trend of the case law in these developing legal areas.

### A.

### THE PROGRESS OF THE TEXAS DEPARTMENT OF CORRECTIONS AS A PENAL INSTITUTION

According to the evidence the Texas Department of Corrections presently contains in excess of 16,500 inmates housed in fourteen separate units which are located throughout the southern and eastern portions of the State of Texas. Twenty percent are mentally retarded, and many inmates are emotionally unstable. Ninety percent are school dropouts and products of permissive environments. The reforms of the TDC over the years have been extensive, largely through the efforts of two outstanding prison administrators, O. B. Ellis and Dr. George J. Beto. Under the Ellis administration there were concerted efforts to acquire greater housing for inmates, to upgrade the quality of employees at the institutions, to increase and broaden educational benefits, to introduce incentive programs for the inmates and to step up agricultural activities and production.

Dr. Beto's tenure as Director commenced in March, 1962, and extends through all periods material to this litigation. The evidence would indicate that the guiding principles under his administration have been to institute programs at the TDC which encourage greater education, emphasize constructive employment and yet maintain discipline. It is apparent that the opportunities to acquire a high school and even a junior college and college education have been greatly broadened and that the variety of skills taught at the institutions offers multiple opportunities to the inmates to learn a trade. This basic format is highly commendable, and the courts have recognized and made it a point to comment upon the programs of this administrator as some of the finest in the nation. Novak v. Beto, 453 F.2d 661, 666 (5th Cir.1971), rehearing denied, 456 F.2d 1303 (5th Cir.1972).

The number of employees at the Texas Department of Corrections under the direction of Dr. Beto is approximately 2,400. There is a warden in charge of each of the fourteen units, and there are periodic staff meetings conducted by the Director and attended by the wardens which relate to prison problems and policy. Dr. Beto has indicated that the administrative structure of the TDC is

somewhat analogous to a quasi-military establishment in which he as the commanding officer is responsible for the activities of all subordinates. He conceded that it is impossible for him to know the daily activities of each employee in the TDC, but he expressed the view that he would become aware of any employee impropriety reasonably soon after it occurred.

For purposes of this litigation, the only three prison units involved are the Eastham and Ellis Units which are maximum security installations and the Wynne Unit which primarily houses mentally disturbed inmates. The Eastham Unit presently contains approximately 1,680 prisoners, the Ellis Unit roughly 1,600 and the Wynne Unit a somewhat lesser number. According to the testimony at the trial each of the units is set up pursuant to a table of organization for security personnel headed by a warden and supported by one or more assistant wardens and subordinate personnel designated as majors, captains, lieutenants and guards. It is certain aspects of the prison conditions as well as the regulations and procedures employed by such prison personnel in controlling the inmates that the defendant has attacked and as to which the testimony is in essentially hopeless conflict. Such complaints as developed through the evidence tend to group themselves into a number of broad categories.

## B.

### THE AREAS OF PRISON LIFE IN CONTROVERSY AND THE DEVELOPING LAW THEREIN

#### 1.

#### ALLEGED BRUTALITY OF INMATES BY PRISON PERSONNEL AND BUILDING TENDERS

Perhaps no area of the evidence forthcoming at the trial was more sharply contested than the issue of inmate brutality at the TDC. Much as it would like to do so, it is impossible for this Court to resolve such contrary testimony by a preponderance of the credible evidence. Consequently, this issue can best be treated by advancing as fully as possible the respective positions of plaintiffs and defendant as to what procedures are used and what conditions actually exist.

The plaintiffs and prison authorities take essentially an absolutist position. A building tender is an inmate appointed by the warden or his representative who possesses the proper attitude and reflects qualities of responsibility and stability. His job is akin to that of a janitor in the tank or wing of the prison cell block. He selects the programs on the television in the day room during recreation periods. He may carry hot water and coffee to the inmates in their cells and deliver messages, papers and mail. Building tenders are not primarily informers, and they have no independent responsibility for discipline of other inmates. However, they are used at times to stop fights, but in doing so they use only their hands. While overreaction is a possibility, abuses by building tenders in this regard are denied. These inmates do not carry clubs, bats, pipes or guns. In 1963 building tenders were used to control berserk inmates; this was felt to be improper, and it was stopped. In 1971 the various wardens were cautioned by the Director not to use convicts as a means to discipline other inmates. It is denied that building tenders run the prison system. Plaintiffs Dreyer and Slayman are building tenders. Plaintiff Lock, while not a building tender, is a trusty. He testified as a plaintiff at the trial that he recalled two building tender inmates beating him in the presence of an officer.

The prison guards are selected men. The administrative procedure followed is to discipline any employee who curses or slaps an inmate; any employee using fists or sticks on an inmate will be discharged. While the officers carry guns at specified times, they never use pipes, bats or clubs. Various forms of disci-

pline of inmates are employed such as, shelling peanuts, standing facing the wall for designated periods of time, segregation and solitary confinement. Standing on a rail has not been used as a form of punishment in the TDC for years. Placing an inmate in a straitjacket only occurs at the Wynne Treatment Center for mental cases; inmates in other units are never placed in straitjackets and then suspended from the bars of a cell under any circumstances. It is denied that inmates caught in homosexual acts have been exhibited in the nude in the halls as a warning to others.

The testimony of inmates on behalf of the defendant is directly to the contrary. Although agreeing with plaintiffs' witnesses as to the general work routine of inmate building tenders, these inmates assert that building tenders are regularly used by the prison officials to discipline the other inmates. They have access to pipes, bats and clubs, and they regularly carry out the orders of the authorities. Building tenders have certain freedom within the prison just so long as they carry out the instructions of the warden or officers. Also, they receive other favors in the form of preferred job assignments or promises of recommendations for parole. According to defense witnesses a tense atmosphere pervades these prison units which creates dissension, fear and distrust and pits one inmate against another.

The defendant's witnesses contend that the officers and guards also participate at times in the beating of inmates. They may use blackjacks, clubs or other weapons as well as spray the inmates with mace. Inmates have been punished by being placed in straitjackets and suspended from the bars of cells; they have been compelled to stand naked on public display in the halls of the prison unit after being caught in homosexual acts. Plaintiff Lock when testifying a second time, this time in favor of defendant, claimed again that building tenders beat up inmates. According to him the only violence at the TDC has come

as a result of the actions of the wardens, officers and inmate building tenders.

Each party rationalizes its position. Plaintiffs allege that they as inmates serving their sentences support the prison administration and the rules of the TDC which are just and necessary and fairly applied. As one of the wardens indicated, the way to help inmates to reform is to get their attention. They are mixed up, and they resent authority. They must learn to stop and think. The counter argument of the defendant is that the penal authorities do not follow the TDC regulations; rather, they play favorites and make up their own rules through the use of unrestrained absolute power from which the inmates have no effective appeal.

Theoretically, the various states have almost uniformly prohibited by statute any form of corporal punishment in state penal institutions. Practically, however, instances of corporal punishment by prison officials have not been so uncommon. *See* Goldfarb & Singer, Redressing Prisoners' Grievances, 39 Geo.Wash.L.Rev. 175, 197 (1970). Typical of the state statutes is that found in Texas. Texas has made the infliction of any form of corporal punishment, including beating, striking or whipping, by prison officials or employees a misdemeanor offense. Tex.Penal Code Ann. art. 349 (1952). A survey of the case law reflects that there has been no reported prosecution under this Texas statute in the thirty-one years that it has been operative.

Apart from a paucity of case law reflecting use of such statutes in the various states, the Fourteenth and Eighth Amendments to the U. S. Constitution have been construed as clearly proscribing uncensured, continuous inmate brutality by prison officials. In Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971), the Court concluded that certain abusive treatment of prison inmates by officials and guards in Virginia, whether sanctioned by prison regulation or not, was of such an outrageous nature that it reached the point of

constituting cruel and unusual punishment. The court indicated that:

> Corporal punishment should never be used under any circumstances. This includes such practices as . . . handcuffing to cell doors or posts, shackling so as to enforce cramped position or to cut off circulation, . . . deprivation of sufficient light, ventilation, food or exercise to maintain physical and mental health, forcing a prisoner to remain awake until he is mentally exhausted . . . .
>
> . . . . . .
>
> The regulations of well-run prisons usually provide, in effect, that force may be used only when necessary to protect one's self or others from injury, or to prevent escape, or serious injury to property.

333. F.Supp. at 648 (quoting from the American Correctional Association, Manual of Correctional Standards 417 (1966)). Similarly, in Jackson v. Bishop, 404 F.2d 571 (8th Cir.1968), the use of a strap by prison employees as a means of punishment of inmates was outlawed. The court indicated that:

> [T]he strap's use, irrespective of any precautionary conditions which may be imposed, offends contemporary concepts of decency and human dignity and precepts of civilization which we profess to possess; and that it also violates those standards of good conscience and fundamental fairness enunciated by this court . . . .

404 F.2d at 579.

Generally, brutality by prison guards erupts as a result of a lack of managerial control and training of lower rank prison personnel. *See* Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971); Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966). In Landman v. Peyton, 370 F.2d 135, 140 (4th Cir.1966), cert. denied, 388 U.S. 920, 87 S.Ct. 2142, 18 L.Ed.2d 1367 (1967), the court aptly stated that:

> Acton's classic proverb about the corrupting influence of absolute power is true of prison guards no less than of other men. In fact, prison guards may be more vulnerable to the corrupting influence of unchecked authority than most people. It is well known that prisons are operated on minimum budgets and that poor salaries and working conditions make it difficult to attract high calibre personnel. Moreover, the "training" of the officers in methods of dealing with obstreperous prisoners is but a euphemism in most states.

The landmark case holding that the widespread use of trusty or inmate guards is in itself a form of outrageous treatment amounting to cruel and unusual punishment is Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970), aff'd, 442 F.2d 304 (8th Cir.1971). In *Holt* the court indicated that the use of inmate guards is "universally condemned by penologists", since it breeds ready and uncontrollable abuse. 309 F.Supp. at 373. The court, accordingly, required that inmate guards "be stripped of their authority over the lives and living conditions of other convicts." 309 F.Supp at 384. The Fifth Circuit has recently taken a somewhat similar view of the use of inmate guards in state prisons. Roberts v. Williams, 456 F.2d 819 (5th Cir.), cert. denied sub nom., Roberts v. Smith, 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1971).

### 2.

### INTRAPRISON DISCIPLINARY PROCEEDINGS

The position of plaintiffs as to the manner in which unit disciplinary committee hearings are conducted supports, in substance, the version of the TDC authorities. As one of the wardens testified, the Rules and Regulations of the Texas Board of Corrections are closely followed. Relevant portions of the section on disciplinary procedures and penalties are as follows:

> Disciplinary action or punishment may include reprimand, loss of privileges, confinement to a cell, assessment of negative points, placement in

solitary confinement, demotion to a less desirable assignment, loss of "good time" or demotion in class.

Officers are required to report all violations of rules and regulations. The inmate or inmates involved will be given a hearing before the Unit Disciplinary Committee. If found guilty, the Unit Disciplinary Committee will determine the punishment or will make a recommendation to the State Disciplinary Committee.

If an inmate believes an order to be unjust, has any complaint concerning an order, or desires to complain about any action, he should notify an officer, who will in turn notify the Assistant Warden.[11]

According to the plaintiffs' account, the Disciplinary Committee consists of three officers with the rank of Lieutenant or higher who hold an informal proceeding and try the inmate. The ranking officer is chairman. The reporting officer as well as the inmate charged with the offense are called upon to give their respective versions; there may be other evidence. Then a decision is reached, and a report is made of the hearing. Normally the warden does not sit on a unit disciplinary committee, but there are exceptions. The wardens did indicate that instances had arisen wherein one of them sat on the disciplinary committee and thereafter approved as warden the punishment meted out by the committee. Inmate appeal from an allegedly unjust ruling is to the State Disciplinary Committee located at the Walls Unit of the TDC. This Committee reviews the unit sentence and can overturn it when it is thought to be erroneous.

The defense witnesses were severely critical of the manner in which the unit disciplinary proceedings are conducted and the arbitrary and inequitable way in which sentences for such violations are meted out by the disciplinary committee. According to some of the inmate witnesses for the defense, it is a "kangaroo court" without any semblance of objectivity and fairness. In addition, there has been testimony at the trial that in numerous instances punishment was assessed summarily by one officer without any hearing whatsoever. Last of all, there is criticism as to the way the personnel records of inmates are kept which include disciplinary reports filled out by such committees. The essence of the complaint is that the records are "doctored" to reflect adverse information about the offending inmate which is used against him at subsequent times when he is considered for job assignments, promotions and other matters.

As in the discussions of prison brutality, there is no common thread of credibility running through the testimony concerning disciplinary hearings which permits this Court to determine where the truth lies. What is of interest is the fact that the most recently published Rules and Regulations of the Texas Department of Corrections dated July 10, 1972, set forth in Chapter V thereof entitled "Disciplinary Procedures" a detailed format that is to be followed in conducting disciplinary hearings. Relevant portions of these revised rules are as follows:

50.5 HEARINGS

50.51 The Disciplinary Committee will meet as often as required to promptly dispose of the cases that have been referred.

50.52 A hearing should take place as soon as practicable after the infraction is reported. If the offense needs immediate investigation, it should be initiated at once and the hearing postponed as long as necessary to complete the investigation.

50.53 If the infraction is serious enough to warrant it or there is danger that the offender will try to influence witnesses, he may be placed in segregation pending investigation and hearing, but should *not* be placed in a punishment status.

11. Plaintiffs' Exhibit No. 123, at 21–22.

50.54 The hearing should be an orderly attempt to arrive at the truth, and it is not a formal court proceeding.

50.55 Hearings should be conducted as follows:

50.551 The inmate is to be brought before the Committee and the charge and offenses read to him. The inmate has had prior reading of the charge and it has been ascertained that he understands the charge.

50.552 The inmate will be given an opportunity to state his case and enter a plea of guilty or not guilty.

50.553 The inmate may be questioned by members of the Committee.

50.554 The reports previously submitted by the reporting officer, the officer who investigated the offense, and any other person having knowledge of the infractions, states the facts and circumstances of the violation.

50.555 The Committee, after due deliberation will make its findings and actions known to the inmate, including any recommended loss of overtime.

50.556 The Committee will also give a brief explanation as to *why* action was taken. (Disciplinary alternatives available to the Committee are outlined in a later section).

NOTE: Wardens act as approving authorities and may approve, modify, or disapprove the Committee's action as they may deem necessary.

The Courts are becoming increasingly attentive to the need for established prison rules and standardized intraprison disciplinary procedures. It is generally recognized that the lack of outside checks including judicial review has fostered the growth of a unique and largely autonomous legal system within the prisons. The movement for reform is buttressed by the argument that a pris-

oner's self-respect and self control as well as his ultimate rehabilitation require the employment of fair disciplinary procedures. *See* Jacob, Prison Discipline and Inmate Rights, 5 Harv.Civ. Rights-Civ.Lib.L.Rev. 227 (1970).

It appears clear that minimal due process safeguards must be acknowledged and followed in any adjudicative proceeding such as a prison disciplinary hearing. *See* In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); Specht v. Patterson, 386 U.S. 605, 87 S. Ct. 1209, 18 L.Ed.2d 326 (1967); Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967); Washington v. Lee, 263 F.Supp. 327 (M.D.Ala.1966) (three-judge court), aff'd, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); K. Davis, Administrative Law Treatise § 7.02 (1959). Intraprison discipline minimum standards have been espoused in a number of recent lower court decisions. In Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971), the court concluded that certain due process rights are constitutionally dictated in prison adjudicatory proceedings. First, the discipline tribunal must be impartial. This requires that the accusing employee or official be excluded from the adjudicative process. Second, there must be a hearing. The inmate must be given notice in writing of the charges to be brought against him at the hearing as well as sufficient time to prepare his defense. At the hearing the inmate must be allowed to interrogate adverse witnesses on his own as well as have the services of a lay advisor to assist him. Similarly, in Sinclair v. Henderson, 331 F.Supp. 1123 (E.D.La.1971), the Court concluded that three procedural safeguards were required: (1) Rules and regulations must be promulgated by prison officials and communicated to inmates; (2) the inmate must be given written notice of the charge; and (3) a hearing must be held at which time the inmate must be given the opportunity to be heard. At the hearing the accusing official must not adjudicate the merits. *See* Sostre v. McGinnis, 442 F.2d 178 (2d Cir.1971),

cert. denied sub nom., Oswald v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972); Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal.1971); Morris v. Travisono, 310 F.Supp. 857 (D.R.I.1970).

Several authors have suggested that the requirements set forth in the Federal Bureau of Prison Regulations and the American Correctional Association, Manual of Correction Standards (1966), including those governing intraprison discipinary hearings, should be adopted as the minimal constitutional standard. Hirschkap & Millemann, The Unconstitutionality of Prison Life, 55 Va.L.Rev. 795, 837 (1969); Turner, Establishing the Rule of Law in Prisons: A Manual for Prisoners' Rights Litigation, 23 Stan.L.Rev. 473, 511 (1971). *See also* Millemann, Prison Disciplinary Hearings and Procedural Due Process—The Requirement of a Full Administrative Hearing, 31 Md.L.Rev. 27 (1971); Jacob, Prison Discipline and Inmate Rights, 5 Harv.Civ.Rights-Civ.Lib.L.Rev. 227 (1970).

### 3.

### SOLITARY CONFINEMENT

A sequel to the inquiry as to prison procedures pertaining to inmate disciplinary hearings and punishment is that related to solitary confinement. In view of the recent exhaustive decision by the Fifth Circuit Court of Appeals on the subject, Novak v. Beto, 453 F.2d 664 (5th Cir.1971), rehearing denied, 456 F. 2d 1303 (5th Cir.1972), this area need not be reiterated in depth, except as the evidence forthcoming in this trial is supplementary thereto.

The 1968 booklet on Rules and Regulations of the Texas Department of Corrections which has been issued regularly to inmates upon admission until promulgation of the revised Rules and Regulations in July, 1972, contains only a brief reference to solitary confinement as a punishment under the section on Disciplinary Procedures and Penalties. As in previous areas of inquiry, the conflicting versions of the parties concerning the procedures followed by the authorities in administering solitary confinement merit summarization of the evidence.

According to the testimony of the wardens, punitive segregation or solitary confinement is served in a cell six feet by nine feet where there is no bed, but there is a blanket and coveralls supplied. There is minimal light along with a lavatory and commode. In the past a prisoner has been fed one full meal every 72 hours, and between full meals he has received bread and water three times a day. Only recently the daily bread and water diet has been replaced by a diet of two hot meals of vegetables only. A prisoner bathes three times a week. He is not naked, unless there is a danger of suicide. A staff medical officer checks the inmate daily. Fifteen days is the maximum period permitted in solitary at any one time. While an inmate may lose weight, it is viewed as virtually impossible under this regimen to lose sizable amounts of weight as a consequence of any one stay in solitary.

The inmates who testified for the defendant criticized the length of time served in solitary confinement. Instances were recounted in which it was claimed that they were held in solitary for periods of 24, 26 and 45 days at a time. One ex-inmate testified that he had been in solitary for four to five months. As a consequence, there were claims of large weight losses which endangered health. The estimates of weight loss generally ranged from 40 to 60 pounds with plaintiff Lock testifying to the greatest loss from 214 to 145 pounds or a loss of roughly 70 pounds while he was kept in solitary confinement.

Concurrent with these complaints is another advanced by the inmates. Following release from solitary, the punished inmate may be ordered into the fields to work in a weakened condition. It is alleged that some have succumbed and even expired in such situations. This is denied by the prison authorities.

The 1972 Rules and Regulations of the Texas Department of Corrections which were published after the trial in this case contain certain detailed provisions pertaining to the diet of inmates in solitary (Art. 50.9233), medical care and procedure in solitary (Art. 50.9234) and return to work of inmates who have served time in solitary confinement (Art. 50.928). An inmate is to be given a light but productive work assignment upon release, the nature of which will vary with the individual involved.

 It is fundamental that the use of punitive segregation, that is, solitary confinement as a form of intraprison discipline, is not per se condemnable as constituting cruel and unusual punishment. Novak v. Beto, 453 F.2d 661 (5th Cir.1971), rehearing denied, 456 F.2d 1303 (5th Cir.1972); Sostre v. McGinnis, 442 F.2d 178 (2d Cir.1971), cert. denied sub nom., Oswald v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972). This form of punishment, while frequently criticized, is permissible if reasonably inflicted and reasonably supervised. The determination of impropriety in this area turns upon the peculiarities of each factual situation under scrutiny. It, simply stated, is a matter of degree.

In Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971), the court concluded that the following practices and conditions in conjunction with solitary confinement were unconstitutionally excessive and, as a result, were condemnable: (1) bread and water diet or, for that matter, any disciplinary diet which impairs health; (2) handcuffs or other forms of restraint on inmates in the solitary cell; (3) lack of adequate clothing; (4) lack of adequate bedding; (5) overcrowding in the solitary cell; (6) use of tear gas; and (7) denial of the privilege to shower regularly. *Compare* Wright v. McMann, 387 F.2d 519 (2d Cir.1967); Jordan v. Fitzharris, 257 F. Supp. 674 (N.D.Cal.1966). *See generally* Singer, Confining Solitary Confinement: Constitutional Argument for a "New Penology", 56 Iowa L.Rev. 1251 (1971); Goldfarb & Singer, Redressing Prisoners' Grievances, 30 Geo.Wash.L. Rev. 175, 186 (1970); Note, The Role of the Eighth Amendment in Prison Reform, 38 U.Chi.L.Rev. 647 (1971).

### 4.

### CENSORSHIP OF PRISONER MAIL

The trial in this case also raised the issue of censorship of mail sent and received by the inmates. This is not a new complaint, and there is presently under submission in the Southern District of Texas a case in which a main issue is that of mail censorship.[12] As the evidence developed in the present trial, the positions of the parties on this subject took shape.

The defendant who advanced the position of the complaining inmates alleged that there has been censorship and copying of inmate correspondence with attorneys which violates the attorney-client privilege as well as censorship in copying of inmate mail with the courts. It was alleged that there is unnecessary delay in the receipt of mail by inmates at the Texas Department of Corrections and that such delays have resulted in failure to file court pleadings and documents within the time prescribed by the court rules. Although it was conceded that incoming mail must be inspected, there were complaints that enclosures to mail were missing when it was ultimately received by the inmates.

The prison authorities who testified at the trial conceded that the officials examine the inmate mail including correspondence with attorneys. There was testimony that copies were made of inmate correspondence with the defendant because her clients were viewed as troublemakers. The general policy requiring mail censorship was stated to be based on the necessity of insuring that

---

12. Guajardo v. McAdams, 349 F.Supp. 211 (S.D.Tex.1972). *See also* Baker v. Beto, 349 F. Supp. 1263 (S.D.Tex.1972).

no narcotics or contraband reached the prisoners, that correspondence was with approved addressees as set forth in the Texas Department of Corrections Rules and Regulations and that there was no development of a conspiracy among the inmates.

The Director of the TDC testified in some detail concerning censorship of the mail in the prison. The prison office processes all legal actions filed by the inmates and keeps a record of them. Some mail is copied in each unit of the prison, but there has been no uniform policy for this procedure. The Director conceded that the subject of censorship of prisoner mail needed reexamination.

Prison administrative action which curtails or interferes with the basic First Amendment freedoms is generally subject to close judicial scrutiny. Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968). The latter court indicated that:

> In . . . the [area] of . . . First Amendment freedoms, we have pointed out that stringent standards are to be applied to governmental restrictions in [this area], and rigid scrutiny must be brought to bear on the justifications for encroachments on such [a right]. The State must strongly show some substantial and controlling interest which requires the subordination or limitation of [this] important constitutional [right], and which justifies [its] infringement, . . . and in the absence of such compelling justification the state restrictions are impermissible infringements of [this] fundamental and preferred [right].

400 F.2d at 541 (citations omitted).

■■ Various courts have outlawed prison practices and procedures which curtail or unduly infringe the basic communications of inmates. *See, e. g.*, Morales v. Schmidt, 340 F.Supp. 544 (W.D. Wis.1972). It appears clear now that prison officials are prohibited from unreasonable interference with inmate correspondence to the various public officials, legislatures, or courts. *See* Spires v. Dowd, 271 F.2d 659 (7th Cir. 1959); Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971); Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I.1970). Generally, however, prison officials are permitted to open and inspect prison correspondence, but are precluded from otherwise impeding or interfering with it, absent the presence of contraband or a similar abuse of this basic right. Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), cert. denied sub nom., Oswald v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972). The latter principle is generally applied as well to attorney-client correspondence. Wright v. McMann, 460 F.2d 126 (2d Cir. 1972). *See* Wilkinson v. Skinner, 462 F.2d 670 (2d Cir. 1972); Note, Prison Mail Censorship and the First Amendment, 81 Yale L.J. 87 (1971).

### 5.

### INMATE ACCESS TO THE COURTS

The testimony at this trial referred periodically to the practices at the TDC which are to permit the inmate to prepare and file petitions for habeas corpus relief and other legal actions. The complaints of the inmates as voiced by the defendant were largely contained in the "Ellis Report".[13] Although a "writ room" has been provided in the various prison units where the inmates can do their legal work, it has been forbidden for one inmate to solicit the help of another. Also, the presence of legal materials of every sort—books, papers and pleadings in an inmate's cell has been considered contraband for which violation the inmate can be placed in solitary confinement. The presence of two staff attorneys to assist inmates has resulted in some help to prisoners in the preparation of habeas corpus petitions to test the validity of a conviction, but such assistance has been wholly inadequate for such a large prison population. Also, it was alleged that the staff attorneys

---

13. Defendant's Exhibit No. 14.

will not assist in the preparation of any civil rights litigation to challenge the rules and regulations of the TDC.

The availability of the "writ room" to inmates was also criticized, since it was alleged that the hours for its use are irregular and uncertain. The filing of legal actions has been belittled and criticized by the prison authorities. Such legal documents, when they are prepared, have been censored, and many writs are alleged to have gone astray and never mailed. Free access to the courts has thus been regularly denied according to the inmates.

The prison officials have responded by testifying that inmate assistance in the preparation of legal documents creates an unsatisfactory element of control of one inmate over another.[14] It was to avoid this situation that the "writ room" was instituted. Because of the inadequate number of attorneys on the TDC prison staff to assist inmates, the prison administration has arranged to hire ten more attorneys with secretarial help in order to process post-conviction remedies and to assist with the personal legal problems of inmates.

 It is well established that "persons in prison, like other individuals, have the right to petition the Government for redress of grievances which, of course, includes 'access of prisoners to the courts for the purpose of presenting their complaints.'" Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263, 267 (1972). This right not only works to preclude direct interference in the form of obstruction of the prepared inmate petitions, but it also applies to the basic opportunity to prepare such petitions within the confines of the penal institution.

In Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), a prison rule was invalidated which banned fellow inmate assistance in the preparation of inmate petitions in the absence of a reasonable alternative being provided. The court concluded that such a regulation, in effect, denied indigent and illiterate inmates reasonable access to the courts in order to attempt to redress their grievances. In Novak v. Beto, 453 F.2d 661 (5th Cir. 1971), rehearing denied, 456 F.2d 1303 (5th Cir. 1972), the Fifth Circuit Court of Appeals considered a similar prohibition outlawing any forms of legal inmate assistance in the Texas prison system. The court noted first that the alternative to inmate assistance in this case was the assistance of one prison staff lawyer, the possibility of the addition of a second staff lawyer and three law students. This appellate court then concluded that:

> [A]lthough we cannot be certain from this record that the TDC has *not* provided a reasonable alternative to inmate legal assistance, neither can we be certain that the TDC *has* provided the requisite alternative. And since we think Johnson v. Avery places the burden of justifying its regulation against inmate legal assistance on the State, we must conclude that the State so far has failed in carrying that burden.

453 F.2d at 664. *See* Beard v. Alabama Board of Corrections, 413 F.2d 455 (5th Cir. 1969); Wainwright v. Coonts, 409 F.2d 1337 (5th Cir. 1969).

 Similarly, inmates incarcerated in a state penal institution have a basic right, subject to reasonable regulations, to have access to an adequate legal library, as well as other legal material, unless a reasonable alternative is provided. Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971), aff'g, Gilmore v. Lynch, 319 F.Supp. (N.D.Cal.1970) (three-judge court). *See* Cruz v. Hauck, 404 U.S. 59, 92 S.Ct. 313, 30 L.Ed.2d 217 (1971); Hooks v. Wainwright, 457 F.2d 502 (5th Cir. 1972). Further, prison officials cannot diminish the constitutionally protected opportunity of inmates to prepare peti-

14. *See* Larsen, A Prisoner Looks at Writ-Writing, 56 Cal.L.Rev. 343 (1938).

tions by engaging in intimidation or harassment, including retaliation or deprivation of privileges when they exercise the right to petition the Government for redress of grievances. Andrade v. Hauck, 452 F.2d 1071 (5th Cir. 1971). *See generally* Goldfarb & Singer, Redressing Prisoners' Grievances, 39 Geo. Wash.L.Rev. 175, 231 (1970).

## IV.

## THE IMPACT ON THE COURTS OF THIS BURGEONING LEGAL AREA OF CONCERN ABOUT THE PRISONS

It is common knowledge and, indeed, a frequent subject of criticism that the majority of federal courts in this country are overburdened and in arrears in the handling of their dockets which often include state habeas corpus petitions as well as prisoner civil rights complaints filed pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, et seq. One source of information reveals that in fiscal year 1970 some eighteen percent of the new filings in federal courts nationwide were prisoner petitions, accounting for some 16,000 matters.[15] As other courts in this Circuit have noted, the growth in the number of prisoner cases filed based on alleged violations of civil rights alone has been phenomenal. Jackson v. Godwin, 400 F.2d 529, 544 (5th Cir. 1968), (Hooper, J., concurring). As a matter of statistical interest, 41 prison inmate petitions for redress under section 1983 have been filed in the Houston Division of the Southern District of Texas since the termination of this trial on May 26, 1972, less than four months ago. Twenty-five of these lawsuits pertain to prison conditions and procedures. In addition, 13 more petitions, 4 of which pertain to prison conditions and procedures, are presently being processed by the United States Magistrates for this District prior to

submission for court approval and filing in forma pauperis. During the same period of time a total of 548 civil cases of every character have been filed with the District Clerk's office in Houston.

Under existing case law the district court may not grant a motion for dismissal unless "it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652, 654 (1972). This is a stringent test. While some cases have been summarily disposed of on such a basis, they may well prove to be in the distinct minority, particularly when there is a relatively high degree of legal knowledge and competence frequently exhibited in the drafting of pleadings by inmates in prison institutions today. Recently, such summary treatment of civil rights actions instigated by state prison inmates has resulted in an abundance of summary reversals by the Fifth Circuit Court of Appeals. *See* Williams v. Wainwright, 461 F.2d 1080 (5th Cir. 1972); Richards v. Smith, 464 F.2d 1029 (5th Cir. 1972); Bowman v. Hale, 464 F.2d 1032 (5th Cir. 1972); Burroughs v. Wainwright, 464 F.2d 1027 (5th Cir. 1972); McCray v. Fondre, 462 F.2d 1374 (5th Cir. 1972); Dennson v. Tomkins, 464 F.2d 1033 (5th Cir. 1972); McCray v. Lee, 463 F.2d 424 (5th Cir. 1972); Simon v. Wainwright, 464 F.2d 1038 (5th Cir. 1972); Brown v. Wainwright, 464 F.2d 1034 (5th Cir. 1972); Huguenot v. Wainwright, 464 F.2d 1077 (5th Cir. 1972); Gardner v. Thompkins, 464 F.2d 1031 (5th Cir. 1972).

With the significant increase in this type of litigation compounded by the requirement that hearings be accorded to the petitioner unless the Haines v. Kerner test, *supra*, can be satisfied, the already serious docket dilemma facing the federal district courts is further aggravated.

15. Hearings on Corrections Before Subcomm. No. 3 of the House Comm. on the Judiciary, 92d Cong., 1st Sess., ser. 15, pt. 3, at 213 (1971) (hereinafter cited as Hearings on Corrections) (Statement of Richard J. Hughes, Chairman, American Bar Association Comm'n on Correctional Facilities and Services).

Another problem surfacing in this area of prison civil rights litigation is the appointment and compensation of counsel to represent the indigent inmates who file these suits alleging constitutional deprivations while incarcerated. Consider the present case in which each of the three plaintiff inmates is represented by court appointed counsel who engaged in varying degrees of extensive pre-trial discovery activities over a period of a month or more to be followed by a solid six weeks attendance at the trial of these cases. In order to comprehend the magnitude of this problem, some consideration of the applicable law as it now stands is warranted.

It is generally acknowledged that if a civil action brought by an indigent acting pro se, including prison inmates, has merit requiring an evidentiary hearing, then counsel should be appointed to properly present the claim. In such a situation it would be highly unrealistic to assume that the indigent plaintiff could effectively prepare and try his own lawsuit. Peterson v. Nadler, 452 F.2d 754 (8th Cir. 1971); Chubbs v. City of New York, 324 F.Supp. 1183 (E.D.N.Y.1971); Note, The Indigent's Right to Counsel in Civil Cases, 76 Yale L.J. 545 (1967). Federal trial courts have statutory authority to appoint counsel for indigents pursuant to 28 U.S.C. § 1915. Peterson v. Nadler, *supra;* Action v. Gannon, 450 F.2d 1227 (8th Cir. 1971); United States ex rel. Gardner v. Madden, 352 F.2d 792 (9th Cir. 1965); Wright v. Rhay, 310 F.2d 687 (9th Cir. 1962), cert. denied, 373 U.S. 918, 83 S.Ct. 1309, 10 L.Ed.2d 418 (1963); Miller v. Miller, 296 F.2d 283 (2d Cir. 1961), cert. denied, 370 U.S. 963, 82 S.Ct. 1591, 8 L.Ed.2d 830 (1962). However, there is a lack of commensurate statutory authority for the payment of compensation to appointed counsel. Absent such authority most courts have concluded that compensation is not payable. *See* Annot., Right of Attorney Appointed by Court for Indigent Accused to, and Court's Power to Award, Compensation by Public, in Absence of Statute or Court Rule, 21 A.L.R.3d 819 (1968).

In the absence of an express statute authorizing the compensation of counsel for the indigent the question arises as to what theories premised on some form of indirect authority might permit the payment of such compensation. First, it is arguable that the statutory authority to appoint counsel to serve an indigent must implicitly authorize the commitment of federal funds for his compensation. *Cf.* Allison v. Wilson, 277 F.Supp. 271 (N.D.Cal.1967). Second, it is arguable that requiring counsel to serve without compensation is a "taking" within the meaning of the "just compensation clause" of the Fifth Amendment. Third, it is arguable that a district court could award compensation under the Tucker Act, 28 U.S.C. § 1346(a)(2), since the latter statute gives such courts jurisdiction over private civil claims founded upon express or implied contracts with the United States. *See* United States v. Dillon, 230 F.Supp. 487 (D.Or.1964), rev'd, 346 F.2d 633 (9th Cir. 1965), cert. denied, 382 U.S. 978, 86 S.Ct. 550, 15 L.Ed.2d 469 (1966). Fourth, it is arguable that a court has inherent power to order payment of compensation in the absence of statutory authority inasmuch as it has inherent power to correct wrongs created by its process. *See* Arkadelphia Milling Co. v. St. Louis Southwestern Railway Co., 249 U.S. 134, 39 S.Ct. 237, 63 L.Ed. 517 (1919); United States v. Morgan, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939).

Notwithstanding the seeming attraction of these theories, they fall far short of their intended mark when viewed in the context of the historical obligation of members of the legal profession to represent indigents upon court order without compensation. In United States v. Dillon, 346 F.2d 633, 635 (9th Cir. 1965), cert. denied, 382 U.S. 978, 86 S.Ct. 550, 15 L.Ed.2d 1989 (1966), it was indicated that "the obligation of the legal profession to serve indigents on court order is an ancient and established

tradition, and . . . appointed counsel have generally been compensated, if at all, only by statutory fees which would be inadequate under just compensation principles, and which are usually payable only in limited types of cases." Further, the latter court indicated that "respresentation of indigents under court order, without a fee, is a condition under which lawyers are licensed to practice as officers of the court, and . . . the obligation of the legal profession to serve without compensation has been modified only by statute." 346 F.2d at 635. *Accord,* Dolan v. United States, 351 F.2d 671 (5th Cir. 1965). *See* Kunhardt & Co. v. United States, 266 U.S. 537, 45 S.Ct. 158, 69 L.Ed. 428 (1925).

 Other methods to compensate appointed counsel are based on less tedious grounds. First, if as a matter of chance a state prisoner categorizes his civil rights action initially as stating a habeas corpus claim, and the court so accepted it for filing, then compensation could very well be paid through the Criminal Justice Act of 1964, 18 U.S.C. § 3006A. *See* Annot., Compensation, Under Subsection (d) of Criminal Justice Act of 1964 (18 U.S.C. § 3006A(d)), of Counsel Appointed for Accused, 9 A.L.R. Fed. 569 (1971); Turner, Establishing the Rule of Law in Prisons: A Manual for Prisoners' Rights Litigation, 23 Stan.L.Rev. 473, 517–18 (1971). Second, a trial court could exercise its equitable power to tax the compensation of appointed counsel against the opposing party. This is an especially viable theory when the indigent's action presents an important constitutional issue and the rights being vindicated are that of a substantial class. Newman v. Piggie Park Enterprises, 390 U.S. 400, 88 S.Ct. 964, 19 L. Ed.2d 1263 (1968); Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.

2d 88 (1962); 3B Moore's Federal Practice ¶ 23.91 (2d Ed. 1969).

Hopefully, this problem will merit serious consideration so that statutory authority will be forthcoming to provide for compensation of appointed counsel in private civil rights actions including those instituted by state prisoners concerning prison conditions and/or procedures. In the meantime, however, appointed counsel who serve in a function appropriately characterized as a "private attorney general" apparently can be compensated only by being commended by the courts for their public service in serving so well to bring to light all of the relevant factors material to their clients' case so that the courts can intelligently arrive at just results.[16]

V.

## THE COURT'S OBSERVATIONS

Having had the benefit of hearing the testimony of over sixty witnesses and having examined in detail the plethora of documents filed during the trial of this case by both sides, this Court through sheer force of circumstances has been exposed to the impact of inmate activities contained in a way of life little known to the "free world". Granted the basic proposition that individuals should not violate the law so that they have to serve time in prison, the fact remains that our prisons are full. With large numbers of inmates incarcerated in limited physical facilities, some of whom are incorrigibles and recalcitrants, there must be a system of rules to be followed as well as prescribed methods of punishment to be properly administered when such rules are violated. That being so, the framework of prison regulations and procedures within which the inmate must live his highly regimented life and serve his sentence must, above all, reflect an evenhanded

16. In this regard, it should be noted that appointed counsel in these cases have not requested compensation for representation of the plaintiffs. At the close of the evidence this Court commented that the thoroughness of preparation as well as the dedication of all counsel in the trial of these cases was in the highest tradition of the Bar. This Court reiterates those observations here.

488

fairness in application at all levels of administrative discipline. While the proof in this case is so extensive and so contradictory as to make impossible the reaching of any conclusion by this Court in favor of either plaintiffs' or defendant's version of what transpires at the TDC, the vast amount of evidence advanced by both sides makes it perfectly apparent that neither version can be summarily dismissed and forgotten.

It is clear that public and legal scrutiny of the prison systems is now underway in this country. Most of our citizenry have known little about procedures in these institutions, and, indeed, in the past there has been little public impetus to become familiar with prison operations. The courts as well have exercised great hesitancy in probing the disciplinary decisions of the prison authorities, relying generally on the "hands off" doctrine for such legal abstention. *See* Startti v. Beto, 405 F.2d 858 (5th Cir. 1969); Bethea v. Crouse, 417 F.2d 504 (10th Cir. 1969); Banning v. Looney, 213 F.2d 771 (10th Cir.), cert. denied, 348 U.S. 859, 75 S.Ct. 84, 99 L.Ed. 677 (1954); Williams v. Steele, 194 F.2d 32, rehearing denied, 194 F.2d 917 (8th Cir.), cert. denied, 344 U.S. 822, 73 S.Ct. 20, 97 L.Ed. 640 (1952). With a lack of public awareness and an absence of independent outside checks on prison methods, it certainly cannot be denied that the opportunity, at least, has been present for a prison system to become a law unto itself. Once such a total institutionalization emerges, its very preservation depends upon the exercise of unrestrained administrative discretion to control every facet of the lives of its inmates.

One vital deterrent to such a situation is the maintenance of a viable administrative structure for the handling of inmate grievances. In Landman v. Peyton, 370 F.2d 135, 141 (4th Cir. 1966), cert. denied, 388 U.S. 920, 87 S.Ct. 2142, 18 L.Ed.2d 1367 (1967), it was aptly stated that "[e]xperience teaches that nothing so provokes trouble for the management of a penal institution as a hopeless feeling among inmates that they are without opportunity to voice grievances or to obtain redress for abusive or oppressive treatment."

As Mr. Chief Justice Burger recently observed:

I think correctional institutions should have an established grievance procedure. . . . [S]ociety should provide a mechanism where the complaints, real or fancied, of prisoners can be heard. And in the process of being heard, most of the complaints will "wash out." If they don't, they should be closely examined by prison administrations.

U.S. News & World Report, August 21, 1972, at 44.

Alleged procedural unfairness at the reporting offense level has been alluded to heretofore. But the administrative mechanism must be meaningful at review levels as well. It is at this point that there must be clear evidence that institutional review meets and satisfies the one criterion that can brook no compromise: Scrupulous fairness and objectivity in reviewing punishment meted out to the inmates. The method of review utilized under the 1968 Revised Rules and Regulations of the TDC is through the use of a State Disciplinary Committee. The latest Rules and Regulations, effective July 10, 1972, are more detailed as to how this institutional review works. The State Disciplinary Committee may approve, modify, return with comments for reconsideration or disapprove the unit recommendation (Art. 50.62); the Director is the final reviewing authority (Art. 50.63); and appeal from the findings made or the penalty assessed may be made directly to the Director by letter or personal interview (Art. 50.64).

Although the testimony at this trial touched only obliquely upon the complaints of inmates concerning the futility of appeal of alleged unjust punishment assessed by the unit disciplinary committee, the basic issue is there. This is so, even though this Court is ful-

ly aware that such a complaint at times can be totally fabricated for selfish reasons by the individual prisoner. The argument is made that administrative review of punishment is not objective and fair inasmuch as the reviewing authority is a part of the prison administration and will unhesitatingly support the actions of the unit disciplinary committee on the scene. In other words, whereas intraprison administration, efficiency and economy may dictate the wisdom of such a closely knit system, the employment alone of institutionalized review of an inmate's complaints, whether they are real or fancied, can readily become a perfunctory procedure and degenerate into something less than a bona fide inquiry.

This problem is not one of first impression and has received the considered attention of highly qualified people in this country. The Committee on the Model Act for the National Council on Crime and Delinquency, a group of experts in penology including Mr. Norman Carlson, Director of the Bureau of Prisons, United States Department of Justice, has worked closely to produce A Model Act for the Protection of Rights of Prisoners. The Section on Grievance Procedure is as follows:

§ 5. Grievance Procedure

The director of the State Department of Correction (or the equivalent official) shall establish a grievance procedure to which all prisoners confined within the system shall have access. Prisoners shall be entitled to report any grievance, whether or not it charges a violation of this Act, and to mail such communication to the head of the department. The grievance procedure established shall provide for an investigation (aside from any investigation made by the institution or department) of all alleged grievances by a person or agency outside of the department, and for a written report of findings to be submitted to the department and the prisoner.[17]

This proposal, it will be noted, provides for an investigation by an outside person or agency as well as by the institution. This modification of the institutionalized format for prison grievance procedures is a version of the "ombudsman" concept, an autonomous individual or entity empowered to receive and investigate prisoner grievances.

Dr. Beto in his testimony made brief reference to this procedural variance, the ombudsman concept, which, as the preliminary background material in connection with the Model Act points up, is in the testing stage in some of the states.[18] Originated in Europe and most notably used in Sweden as a solution to this type of problem, the ombudsman constitutes a third force, neither allied with the inmates nor the prison administration, which functions independently much like the Inspector General in the United States Army. It investigates allegations of administrative malpractice with a view toward correcting abuses in the operation of the prisons. The office of the ombudsman thus becomes the mechanism whereby fair and objective review of alleged prison abuses is thoroughly undertaken. It is here that the complaints may be administratively "washed out", through the ombudsman's exercise of extensive investigatory powers within the prisons and thereafter coordination with the prison authorities to remedy meritorious complaints. This serves to reduce the use of extended court procedures with the attendant risk of inconsistent court rulings as to what codes of conduct should be followed in penal institutions.

The ombudsman concept is not an instant panacea,[19] and it has its detrac-

17. National Council on Crime and Delinquency, Comm. on the Model Act, A Model Act for the Protection of Rights of Prisoners 17 (1972).

18. *Id.* at 12.

19. The Committee on the Model Act for the National Council on Crime and Delinquency point up defects that have arisen in two ombudsman programs in Oregon and Canada which basically are (1) lack of complete independence of the

tors. Dr. Beto evidenced no great enthusiasm for it on the theory that such an individual, office or agency possessed outward authority without concurrent responsibility. This observation cannot be ignored, since there is general agreement that the ombudsman's power to investigate is not supplemented by a concurrent power to command or reverse prison administrative decisions. Instead, he recommends changes to the prison authorities and, additionally, he may obtain the ear of the legislature and the public, where appropriate. That being so, such a status with its specific power limitations may well be its very strength and not its weakness. The absolute independence of the ombudsman from a prison administration can be the guarantee which insures that the inmate grievances will be heard and accorded an objective review and, where meritorious, that something will be done about them.

Were it not for the Model Act heretofore discussed, the ombudsman programs under way in other states to solve this problem as well as the intense interest in the ombudsman concept in modern penology evidenced at hearings before a Congressional Subcommittee considering processes by which inmates' grievances are articulated,[20] this Court would be most reluctant to make reference to its development. But objections to its efficacy have been raised before, and they have proved to be anything but fatal to further consideration of the ombudsman

concept.[21] While it is probably fair to assume that most prison administrators would initially react adversely to the creation of an ombudsman, since the very nature of the role exposes the prison administrator's practices to constant scrutiny by an individual or agency representative of the state citizenry, it can serve a highly beneficial function from the prison administration's point of view as well: The providing of an early warning of developing problems within the institution and a clarification of the truth as to what actual conditions and procedures exist in the prison units.

The light of day focused on prison practices by a third independent force accountable only to the legislature and to the public can be a salutary one, if properly structured within a state.[22] The very presence of the ombudsman can serve to eliminate or, at least, reduce the polarization of views of witnesses representing the prison administration vis-a-vis the inmates at court proceedings which, as this extended litigation has amply proven, may resolve nothing, either in ascertaining the truth of an individual incident or in identifying the root evil, if any, to be corrected. Instead, when instances arise in which hearings are ultimately required to air prisoner grievances, there would be another potential source of information, presumably highly reliable, which would be of assistance in the determination of the truth of the matter and the arrival at a just solution.

---

ombudsman from the prison administration and consequent lack of power to bring about change of unfair practices in the prison and (2) inability of the ombudsman to be completely free from political pressures of the legislature. *Id.* at 12 n. 10.

20. Hearings on Corrections, *supra* note 15.

21. Hearings on Corrections, *supra* note 15, at 171–75, 421–25.

22. The precise function of the ombudsman and the position which he occupies in certain states testing the concept is discussed in some detail in Hearings on Corrections, *supra* note 15. The Pennsylvania program is one of unique in-

terest, since it is privately administered by a General Committee of the Pennsylvania Prison Society, augmented by individuals and agency representatives of the state community to insure broad representation, diverse expression of viewpoints and a degree of expertise in the areas of corrections and administration of criminal justice. Other states referred to as utilizing or contemplating some form of the ombudsman concept are California, Oregon, Hawaii, Nebraska and Kings County in Washington. There may be others. Ombudsmen also exist in Canada, England, Finland, New Zealand, Norway, Sweden and Tanzania.

The courts cannot and should not avoid exercising jurisdiction of these cases when it is necessary to do so. Prisoners necessarily retain an inviolate right to petition the courts. Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L. Ed.2d 263, 267 (1972); Andrade v. Hauck, 452 F.2d 1071, 1072 (5th Cir. 1971); Coleman v. Peyton, 362 F.2d 905, 907 (4th Cir.), cert. denied, 385 U. S. 905, 87 S.Ct. 216, 17 L.Ed.2d 135 (1966). However, by providing an administrative mechanism to dispose of grievances short of court action which is more immediately accessible to the prisoners and much closer to the problems of the prison administration, their satisfactory solution should be much more readily achieved.[23] Such a practice, if successful to any significant degree, could do much to alleviate crowded court dockets as well as diminish the multitude of charges so frequently voiced that the courts are taking over and are bent on dictating the administrative procedures to be followed in the prisons.

## VI.

### CONCLUSION

After a thorough scrutiny of all the evidence presented at the trial of these consolidated lawsuits in conjunction with the applicable law, the Court concludes as follows:

(1) The jurisdictional requisites for a viable cause of action under the Civil Rights Act of 1871, 42 U.S.C. § 1983, are lacking in these lawsuits;

(2) The jurisdictional requisites for a viable cause of action under the diversity of citizenship statute, 28 U.S.C. § 1332, are lacking in these lawsuits;

(3) The jurisdictional requisites for a viable cause of action under the doctrine of pendent jurisdiction in conjunction with the Texas statute, Tex.Rev.Civ. Stat.Ann. art. 4642, are present in these lawsuits;

23. "The Model Statute is intended to encourage administrators to make changes without suit, but where this does not occur, it gives the Courts the necessary

(4) The factual and legal requisites for establishing that the defendant organized and/or implemented conspiratorial activities within the confines of the Texas prison system which deprived plaintiffs of protectable rights, as alleged by the plaintiffs, are lacking in these lawsuits.

(5) The Court, therefore, finds for the defendant.

jurisdiction." National Council on Crime and Delinquency, Comm. on the Model Act, A Model Act for the Protection of Rights of Prisoners 10 (1972).